IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC.,<br><br>　　　　　Defendants. | CIVIL ACTION FILE NO.<br>_____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs file this complaint against the above-named defendants and, on information and belief, and demanding trial by jury, complain and allege as follows:

### NATURE OF THE ACTION

1.　　Plaintiffs Cobb Theatres III, LLC ("Cobb III") and Cobb Theatres IV, LLC ("Cobb IV") (together, "Cobb") bring this action to obtain compensatory damages, treble/punitive damages, injunctive relief, the expenses of litigation and the cost of suit, including a reasonable attorney's fee, and other relief for violations of federal antitrust law and Georgia state law by Defendants AMC Entertainment Holdings, Inc., AMC Entertainment Inc., and American Multi-Cinema, Inc.

(together, "AMC" or "Defendants") with respect to the licensing of desirable "first run," feature-length motion pictures for theatrical exhibition to the public ("films"). AMC has used its worldwide and national circuit power and its market power in a substantial number of geographic markets to coerce film distributors to deprive Cobb, its only competitor in one of the relevant geographic and product markets, of fair competitive access to films to exhibit to the public at its competing theater and to coerce landlords out of leasing theater space to its competitors, including Cobb, all as a means of perpetuating and enlarging its monopoly power in several markets and of insulating itself from competition on the merits. This illegal conduct has deprived the public of choice with respect to the theaters in which they see films, has caused a reduction in the overall quality of movie theaters offered to the public, has severely damaged competition in licensing and exhibition of films, has damaged Cobb's business and property, and is likely to continue unless enjoined by the Court.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1367, and 1332 and 15 U.S.C. §§ 4 and 15(a). Cobb alleges violations of the Sherman Antitrust Act over which this Court has jurisdiction under 15 U.S.C. §§ 4 and 15 and 28 U.S.C. § 1337(a). This Court also

has federal question jurisdiction over Cobb's federal antitrust claims under 28 U.S.C. § 1331. The licensing and exhibition of films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce. AMC's activities in purchasing equipment, services, and supplies as well as licensing films for its theaters substantially affect interstate commerce. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 and diversity jurisdiction under 28 U.S.C. § 1332 over Cobb's state-law claims. The amount in controversy exceeds $75,000.

3.     This Court has personal jurisdiction over Defendants because they have, either directly or through their named subsidiaries, purposefully availed themselves of the benefits and protections offered by the State of Georgia by conducting business in this State and have committed tortious acts within this State, and their conduct in and contacts with this State give rise to the causes of action alleged herein.

4.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this District is the district in which a substantial part of the events giving rise to the claims occurred; under 15 U.S.C. § 22, as Defendants, either directly or through their named subsidiaries, transact business in this District; and under 15 U.S.C.

§ 26, as Cobb seeks injunctive relief against threatened loss or damage by violations of the federal antitrust laws.

## PARTIES

5.     Cobb III is a limited liability company organized and existing under the laws of the State of Alabama with its principal place of business in Birmingham, Alabama. Cobb IV is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Birmingham, Alabama. Cobb III's and Cobb IV's sole members are (1) Robert M. Cobb, a citizen of Alabama, (2) Cobbster, Ltd., a limited partnership organized and existing under the laws of the State of Alabama, and (3) Cobbster II, LLC, a limited liability company organized and existing under the laws of the State of Alabama. The partners of Cobbster, Ltd. and the members of Cobbster II, LLC are citizens of Alabama and Georgia.

6.     Cobb, through Cobb IV, operates seven "CinéBistros," which are fully integrated upscale cinema and dining venues located in Georgia, Florida, Virginia, and Colorado, including the CinéBistro at Town Brookhaven (the "Brookhaven CinéBistro") in Brookhaven, Georgia. As of September 30, 2013, Cobb owned, operated, or held interests in 19 theaters with a total of 231 screens.

7.    Defendant AMC Entertainment Holdings, Inc. is a Delaware corporation with its headquarters in Kansas City, Missouri. Dalian Wanda Group Co., Ltd. (the "Wanda Group"), a Chinese private conglomerate, holds approximately 80% of AMC Entertainment Holdings, Inc.'s outstanding common stock and approximately 92% of the combined voting power of its outstanding common stock.

8.    Defendant AMC Entertainment Inc. is a Delaware corporation with its headquarters in Kansas City, Missouri and is a direct, wholly-owned subsidiary of defendant AMC Entertainment Holdings, Inc.

9.    Defendant American Multi-Cinema, Inc. is a Missouri corporation with its headquarters in Kansas City, Missouri and is a direct, wholly-owned subsidiary of Defendant AMC Entertainment Inc.

10.    As of June 30, 2013, AMC owned, operated, or held interests in 343 theaters with a total of 4,937 screens worldwide, primarily in North America.

11.    Measured by number of screens, AMC is the second-largest theater circuit in the United States.

12.    The Wanda Group is the largest theater exhibition operator in China through its controlling ownership interest in Wanda Cinema Line, which was

ranked as the #1 movie theater chain by market share in 2012 in China, with 126 locations and 1,095 screens.

13.     As stated in a Wanda Group press release, through "the Wanda Group['s] [controlling] own[ership] [interest in] AMC, [the] world's No. 2 Cinema Line, and Wanda Cinema Line, Asia's No. 1, [the Wanda Group is] the world's largest cinema operator."

## SERVICE OF DEFENDANTS

14.     Defendant AMC Entertainment Holdings, Inc. may be served by delivering the summons and complaint to its registered agent, The Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

15.     Defendant AMC Entertainment Inc. may be served by delivering the summons and complaint to its registered agent, The Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

16.     Defendant American Multi-Cinema, Inc. may be served by delivering the summons and complaint to its registered agent, C T Corporation System, which is located at 1201 Peachtree Street, N.E., Atlanta, Georgia 30361.

## DEFINITIONS AND INDUSTRY STRUCTURE

17.    Films are a unique form of entertainment. The experience of viewing a film in a theater differs from live entertainment (*e.g.*, a stage production), a sporting event, or viewing a motion picture in the home (*e.g.*, on a DVD or via pay-per-view).

18.    Home viewing of motion pictures is not a reasonable substitute for viewing films in a theater. When consumers watch motion pictures in their homes, they typically lose several advantages of the theater experience, including the size of screen, the sophistication of sound systems, the opportunity to watch in 3-D, and the social experience of viewing a film with other patrons. Additionally, the most popular, newly released or "first run" motion pictures (films) are not available for home viewing.

19.    Differences in the pricing of various forms of entertainment also reflect their lack of substitutability in the eyes of consumers. Ticket prices for films are generally different from prices for other forms of entertainment. Tickets for most forms of live entertainment typically are significantly more expensive than film exhibition tickets. Renting a motion picture DVD for home viewing is usually significantly less expensive than viewing a film in a theater.

20.   "Exhibitors" are persons or companies that operate one or more theaters in which films are exhibited or shown to the public. Many theaters have multiple screens, each of which is located in its own auditorium, thereby allowing more than one film to be exhibited in the theater at the same time. Such theaters are known as multiplexes, megaplexes, or theater complexes. The most important driver of the economic success of an exhibitor is fair competitive access to films.

21.   "Distributors" are companies that arrange for the marketing, promotion, and licensing of films for exhibition to the public in theaters throughout the United States and the world. The distribution level of the film industry is highly concentrated, with film distribution rights generating the vast majority of box office revenues being controlled by a small number of distributors.

22.   "First run" when used in connection with motion pictures means the number of weeks following the release date of a motion picture for which an exhibitor has licensed a new film.

23.   "Blockbuster" hits aside, a modern motion picture's theatrical exhibition life generally is no more than a few weeks, approximately 90–120 days after which it is released in other entertainment formats (*e.g.*, DVD and pay-per-view television).

24.     For this reason, a motion picture's first run typically is its only theatrical run, except for a limited number of motion pictures that will be licensed for a second run or sub run in certain markets at discounted admission prices.

25.     An exhibitor who cannot obtain license rights to a motion picture for first run likely will never have access to the motion picture, or will have access to it only after its theatrical exhibition value has been virtually exhausted.

26.     Before a film is released, distributors engage in extensive research, audience tracking, and sophisticated modeling to estimate its likely range of revenues in order to, among other things, determine promotional and advertising budgets. Thus, well before a film is licensed to exhibitors, distributors have a well-informed expectation as to its likely revenues.

27.     Distributors often refer to "zones" in connection with film licensing and exhibition. Zones are geographic or trade areas in a city or other area of significant population. Some film zones are "non-competitive." That is, the zone has only one theater, whose exhibitor faces no competition in the markets for (1) exhibiting films to the public in that zone and (2) licensing films from distributors for exhibition in that zone. Other film zones are "competitive." That is, the zone has more than one theater, whose exhibitors compete with one another in the

markets for (1) exhibiting films to the public in that zone and (2) licensing films from distributors for exhibition in that zone.

28.    AMC operates a substantial number of theaters across the United States in non-competitive zones. In these zones, AMC is the monopolist exhibitor in the markets for (1) exhibiting films to the public in those zones and (2) licensing films from distributors for exhibition in those zones.

29.    A "clearance" is an exclusivity agreement, express or implied, between a preferentially-treated exhibitor and a distributor under which the distributor agrees that it will not license a film to play or run at the same time (sometimes referred to as "day and date" play) with any other theater in a zone.

30.    In the past, the primary justification for clearances was the expectation that the licensed exhibitor would pay for substantial extra promotion or advertising in its market if it had "clearance" over a competing exhibitor in the same market; however, presently such substantial promotional expenditures by exhibitors are rare.

31.    In recent years, most distributors have adopted a "wide release" strategy for the majority of their films, whereby they try to earn as much revenue as possible in the first several weeks after release by showing the film on as many screens and in as many theaters as possible. Release date "screen count," the

number of screens on which a film is exhibited on the date of its release, has become an important measure of a film's success from the distributors' perspective.

32.   Dominant exhibitor circuits like AMC derive substantial market power from their ability to provide numerous exhibition locations or runs simultaneously to distributors for the wide release of a film, including locations in non-competitive zones where a distributor has no other alternative exhibitor to play a film.

33.   "Circuit deals" are agreements or understandings, express or implied, whereby dominant exhibitor circuits use their circuit and market power to obtain, among other preferential film licensing treatment, clearance agreements that exclude other exhibitors from playing motion pictures day and date or at all on first run, despite the fact that such clearance agreements are not in the independent economic best interest of the distributors coerced or induced to grant such clearances.

34.   Circuit deals have long been illegal under antitrust law as set forth, *inter alia*, by the United States Supreme Court decisions in *United States v. Griffith*, 334 U.S. 100 (1948), and *United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944), and violate the antitrust requirement that films be licensed on a

theater by theater, film by film basis, as set forth in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948).

## THE COMPETING THEATERS

35.   The AMC Phipps Plaza 14 is a 14-screen, 1,046-seat theater located in Phipps Plaza shopping mall in "Buckhead," the uptown district of Atlanta, Georgia comprising approximately the northern fifth of the city.

36.   The AMC Fork & Screen Buckhead is a 6-screen, 650-seat theater located in or around the Lenox Square and Phipps Plaza area in Buckhead in the lower level of an office tower. The AMC Fork & Screen Buckhead and the AMC Phipps Plaza 14 are approximately 0.6 miles apart.

37.   Cobb's Brookhaven CinéBistro is a 7-screen, 758-seat theater combining an upscale dining experience with film exhibition located in Town Brookhaven, a mixed-use development approximately 2.4 miles northeast of the AMC Phipps Plaza 14 and 3.0 miles northeast of the AMC Fork & Screen Buckhead.

38.   Amenities at the Brookhaven CinéBistro include free valet parking on weekends and holidays, reserved seating, elegant and sophisticated auditoriums and lounges, high-back leather rocking chairs, in-theater, full-service dining prior to the start of the film, a freshly prepared and seasonal American bistro menu and

full bar (in addition to traditional movie theater snacks), 100% digital cinema and theater sound technology, 3-D capabilities, and no on-screen advertisements. The Brookhaven CinéBistro also offers an adults-only (21 years of age or older) environment after 6:00 p.m.

## RELEVANT MARKETS

**Geographic Market**

39.     Moviegoers who reside in or around Buckhead and Brookhaven ("the Buckhead-Brookhaven zone") are reluctant to travel significant distances outside of this zone to attend a film exhibition except in unusual circumstances, due in part to heavy traffic congestion as a result of significant population density in the zone. One of the relevant geographic markets for purposes of the antitrust claims in this action is the Buckhead-Brookhaven film licensing and exhibition zone.

40.     AMC's Buckhead theaters and Cobb's Brookhaven CinéBistro are the only film theaters in this zone.

**Primary Product Market**

41.     The relevant primary product market consists of the market for licensing films. AMC's Buckhead theaters and the Brookhaven CinéBistro are the only exhibitors competing to license films from distributors for exhibition to the public in the Buckhead-Brookhaven zone.

42.    One indication of an exhibitor's film licensing market power in a given zone is the percentage of theater seats in that zone that it controls. For example, if an exhibitor controls 100% of the seats in a zone, it is the only exhibitor bidding for film licenses and so by this measure has a 100% market share.

43.    By this measure, AMC, with ownership or control of 1,696 of the 2,454 total exhibitor seats in the Buckhead-Brookhaven zone, controls 69% of the market for film licenses in that zone.

44.    By virtue of, *inter alia*, its high market share and its circuit power, AMC has market—indeed, monopoly—buying power in that market.

45.    AMC's monopoly power is further evidenced by its ability to force distributors to exclude the Brookhaven CinéBistro from the market, as detailed below, and the high barriers to entry into the market.

46.    The Brookhaven CinéBistro engages in substantial advertising and promotion and creates an equally if not considerably more pleasant and enjoyable movie-going experience than either of AMC's Buckhead theaters, all at its sole expense and to the benefit of distributors through increased ticket sales and film licensing payments.

47.     By contrast, AMC's Phipps Plaza 14 and/or Fork & Screen Buckhead deter customers with on-screen advertising, harsh neon lighting, limited food and beverage offerings (and distracting food and beverage service throughout the entire film-play period at the AMC Fork & Screen Buckhead), accommodation of loud children and young people who can destroy the movie-going experience for others, and generally less pleasant atmosphere.

48.     Notwithstanding the comparable or superior quality of the Brookhaven CinéBistro, some distributors, at the behest of AMC, have given AMC preferential treatment and have deprived the Brookhaven CinéBistro of the ability to fairly compete on the merits with AMC's Buckhead theaters for film licenses, as detailed below.

**Secondary Product Market**

49.     The relevant secondary product market consists of the market for exhibition of films to patrons. AMC's Buckhead theaters and the Brookhaven CinéBistro are the only exhibitors competing to exhibit films to the public in the Buckhead-Brookhaven zone.

50.     One indication of an exhibitor's film exhibition market power in a given zone is the percentage of theater seats within that zone that it controls. For example, if an exhibitor controls 100% of the seats in a zone, it is the only

exhibitor selling theater tickets to the public and so by this measure has a 100% market share.

51.    By this measure, AMC, with ownership or control of 1,696 of the 2,454 total exhibitor seats in the Buckhead-Brookhaven zone, controls 69% of the market for exhibiting films in that zone.

52.    By virtue of, *inter alia*, its high market share and circuit power, AMC has market—indeed, monopoly—power in that market.

53.    AMC's monopoly power is further evidenced by its ability to exclude the Brookhaven CinéBistro from the market, as detailed below, and the high barriers to entry into the market.

## ANTICOMPETITIVE CONDUCT AND EFFECTS

**The Buckhead-Brookhaven Zone**

54.    In 2008, Cobb and AMC competed for a lease on the space in Town Brookhaven that Cobb ultimately won. Starting in 2010, Cobb built the Brookhaven CinéBistro in this location. The Brookhaven CinéBistro opened for business in September 2011.

55.    Prior to approximately 2009, AMC generally did not demand clearances over nearby competing theaters throughout the United States. Instead, it competed on the merits.

56.    In 2009, AMC underwent a significant management restructuring. Gerardo ("Gerry") Lopez was appointed the new President and CEO and elected to AMC's board of directors.

57.    As a result of the restructuring, AMC began a national exclusionary campaign in which it used its dominant circuit position, and its monopoly power in a substantial number of film licensing and exhibition zones, to demand unreasonable clearances over other exhibitors in competitive zones.

58.    Pursuant to this campaign, in the Fall of 2010, Rich Boynton, Senior Vice President and Head Film Buyer for the AMC Phipps Plaza 14 and the AMC Fork & Screen Buckhead, sent a letter to the major film distributors in which he stated:

> [The Brookhaven CinéBistro] is 1.9 miles northeast of our AMC PHIPPS 14 and 2.5 miles northeast of our AMC FORK & SCREEN BUCKHEAD 6,[1] and thus we will not play day-and-date with a venue at this location. . . . We have played 100% of your wide commercial releases and look forward to continuing that arrangement going forward.

59.    This letter operated as a *de facto* demand by AMC for preferential or exclusive film licensing treatment over the Brookhaven CinéBistro—a demand that

---

[1] As alleged above, these statements of distance are not accurate. The Brookhaven CinéBistro is approximately 2.4 (not 1.9) miles northeast of the AMC Phipps Plaza 14 and 3.0 (not 2.5) miles northeast of the AMC Fork & Screen Buckhead.

distributors (1) refuse to license certain films to the Brookhaven CinéBistro or else risk being denied the grossing potential of AMC's Buckhead theaters and, implicitly, some or all of the theaters in its entire circuit, and that they (2) allow *AMC* to play films at *its* two Buckhead theaters day and date but refuse to license the Brookhaven CinéBistro for day and date play with those same theaters.

60.    In response to AMC's letter, several of the major film distributors began honoring AMC's demand for preferential treatment/clearance/exclusivity by (1) allocating films between AMC's Buckhead theaters and the Brookhaven CinéBistro, with the Brookhaven CinéBistro generally being allocated substantially fewer of the highest-grossing, most popular films, and (2) conditioning the license of high-grossing, popular films to the Brookhaven CinéBistro on its agreement to play such films on several, *i.e.*, 3–4, of its 7 screens. These practices continue today.

61.    For example, between January 1, 2013 and October 27, 2013, the only films released in 2013 that Sony Pictures licensed to the Brookhaven CinéBistro were *Elysium* and *Captain Phillips*; during the same time period, Sony Pictures licensed to one or both of AMC's Buckhead theaters *After Earth*, *The Amazing Spider-Man*, *Battle of the Year*, *The Call*, *Carrie*, *Evil Dead*, *Grown Ups 2*, *The Mortal Instruments*, *One Direction: This Is Us*, *This Is the End*, *White House*

*Down*, and *Zero Dark Thirty*. And Warner Bros. Pictures conditioned its license of *The Hobbit: The Desolation of Smaug* to the Brookhaven CinéBistro on the Brookhaven CinéBistro's agreement to play the film on 4 of its 7 screens.

62.    These distributors' general refusal to offer fair competitive access to high-grossing, popular films to the Brookhaven CinéBistro results entirely from AMC's exclusionary demands backed by its circuit and monopoly power, and has nothing to do with the distributors' assessment of the quality and customer-drawing capacity of the Brookhaven CinéBistro.

63.    Indeed, day and date play has become common in the industry; distributors routinely grant licenses to AMC to play day and date with its own theaters (including the AMC Fork & Screen Buckhead and the AMC Phipps Plaza 14) and theaters of other dominant exhibitors; and it would be in the independent best economic interest of the distributors to license to the Brookhaven CinéBistro and AMC's Buckhead theaters for day and date play.

64.    If AMC did not demand preferential treatment/clearance/exclusivity over the Brookhaven CinéBistro, distributors would not enforce clearances in this zone.

65.    In order to survive economically, an exhibitor needs fair competitive access to films. AMC's demands for preferential treatment/clearance/exclusivity

have the effect of denying Cobb, at least in part, the revenue it needs to stay in business.

66.    AMC's demands for preferential treatment/clearance/exclusivity have the effect of limiting Buckhead-Brookhaven moviegoers' theater choices.

67.    AMC's demands for preferential treatment/clearance/exclusivity have the effect of forcing Buckhead-Brookhaven moviegoers to see certain films at AMC's Buckhead theaters or else not see them at all, thus depriving the public of freedom of choice as to where to view films.

68.    AMC's demands for preferential treatment/clearance/exclusivity have the effect of lowering the overall quality of Buckhead-Brookhaven moviegoers' experience by forcing them to see certain films at AMC's Buckhead theaters or else not see them at all.

69.    AMC's demands for preferential treatment/clearance/exclusivity have also damaged Cobb's relationships with distributors.

70.    When one distributor, effectively at the behest of AMC, requires the Brookhaven CinéBistro, as a condition of licensing a film, to play the film on 3–4 of its 7 screens, the Brookhaven CinéBistro is forced to choose between (1) not licensing that film at all or (2) licensing that film, but damaging its relationships

with other distributors by taking those other distributors' films off of its screens long before those films' grossing potential has been exhausted.

71.   By enforcing clearances that damage Cobb's relationships with distributors, AMC makes it even easier for itself to enforce clearances the next time around, leading to a positive anticompetitive feedback loop whose only theoretical resting point is the Brookhaven CinéBistro's closure or inability to exist in its current form.

72.   AMC's anticompetitive conduct described above, done with the predatory intent to deprive the Brookhaven CinéBistro of a fair competitive opportunity to obtain the supply of films needed for effective competition, violates antitrust principles long established by the United States Supreme Court requiring that films be licensed on a film by film, theater by theater basis without the discriminatory preferences in favor of one or more dominant theater circuits that constitute illegal circuit dealing.

73.   The conduct of AMC as described above also constitutes monopolization and/or attempted monopolization of the market for film licenses in the Buckhead-Brookhaven zone: AMC has used and continues to use its monopoly power in that market and in a substantial number of non-competitive markets across the United States with the intent and effect of maintaining and expanding its

monopoly power in the market for film licenses in the Buckhead-Brookhaven zone by excluding and eventually eliminating its competitor, the Brookhaven CinéBistro, leaving AMC with a complete monopoly.

74.    The conduct of AMC as described above also constitutes monopolization and/or attempted monopolization of the market for the exhibition of films in the Buckhead-Brookhaven zone: AMC has used and continues to use its monopoly power in that market and in a substantial number of non-competitive markets across the United States with the intent and effect of maintaining and expanding its monopoly power in the market for the exhibition of films in the Buckhead-Brookhaven zone by excluding and eventually eliminating its competitor, the Brookhaven CinéBistro, leaving AMC with a complete monopoly.

75.    The exclusive contracts AMC has demanded from and entered into with distributors constitute contracts, combinations, and/or conspiracies in restraint of trade and commerce in the markets for film licenses and exhibition in the Buckhead-Brookhaven zone in that they have the intended effect of maintaining and expanding AMC's monopoly power and of foreclosing competition in those markets within that zone.

76.    AMC stated in its recent S-1 filing: "The combined ownership and scale of AMC and Wanda Cinema Line, has enabled us to . . . work[] together . . .

with the goal of gaining greater access to [Hollywood studios' and other production companies'] content and playing a more important role in the industry . . . ."

77.   AMC, which, combined with Wanda Cinema Line under the controlling ownership interest of Wanda Group, is the "world's largest theatrical exhibition operator in terms of revenue," is in fact using its worldwide and national circuit power as well as its monopoly power in a substantial number of non-competitive zones to *coerce* the Hollywood studios and other production companies to *deny* their competitors (like Cobb) fair competitive access to films so as to drive them out of business, prevent them from earning the revenues needed for expansion, and foreclose  competition.

78.   As alleged, the Brookhaven CinéBistro offers the same or higher quality movie-going experience per dollar spent than AMC's Buckhead theaters do.

79.   Therefore, for every film license of which Cobb is deprived not on the merits but as a result of AMC's leveraging its circuit and monopoly power to strong-arm distributors into not licensing films to Cobb, consumers are made worse off. With respect to those films, consumers are left with one theater choice (AMC's Buckhead theaters), which is no choice at all. AMC's clearance demands

have injured, and will continue to injure, Cobb and the consuming public unless enjoined.

**Other Zones**

80.    AMC stated in its recent S-1 filing, "We believe the industry is in the early stages of once again significantly upgrading the movie-going experience, and this shift towards quality presents opportunities to those who are positioned to capitalize on it."

81.    Circuits like Cobb are at the forefront of this trend due to foresight, planning, innovation, and business acumen.

82.    AMC is not well positioned to capitalize on the industry shift towards quality.

83.    AMC must spend substantial time and money refurbishing its old, outdated theaters before it can offer a product capable of competing on the merits with Cobb's.

84.    AMC has launched a nationwide unlawful, anticompetitive, and exclusionary strategy to "buy time" while it upgrades its theaters.

85.    AMC is using or attempting to use its circuit power and its monopoly power in a substantial number of non-competitive zones to drive high-quality theaters out of markets in which they compete with AMC and to raise the barriers

to entry into markets in which AMC is the incumbent monopolist and markets in which AMC plans to expand, all with the intent and effect of perpetuating and enlarging its monopoly power in those markets.

86.    AMC's use of its circuit and monopoly power to prevent the Brookhaven CinéBistro from competing against its Buckhead theaters is part and parcel of this larger anticompetitive strategy.

87.    More specifically, when AMC's competitors, such as Cobb, engage in preliminary lease conversations or negotiations with a landlord for a theater space that is nearby an existing AMC theater, AMC tells the landlord that if the landlord leases the space to AMC's competitor, AMC will not play films at its existing theater day and date with the new theater entrant, *e.g.*, threatens that the new entrant will "have a hard time getting film product" if the space is leased to the competitor.

88.    In other words, AMC, backed by its circuit power and its monopoly power in a substantial number of non-competitive zones, threatens to make the landlord's lease to AMC's competitor less lucrative by effectively creating a clearance or allocation system in favor of AMC's existing theater and against the new entrant, thereby reducing customer traffic to the landlord's shopping mall, plaza, or development. By threatening to enforce clearances and thereby reducing

the landlord's likelihood of granting the prospective new entrant the lease, AMC raises the prospective new entrant's barriers to entry and prevents it from competing with AMC for film licenses and customers.

89.    This precise scenario occurred when Cobb was competing with AMC for a lease on a space near an existing AMC theater in Chicago, Illinois in June 2012, and when Cobb was looking into leasing spaces, both near existing AMC theaters, in Gulf Stream Park in Hollywood, Florida and in Dadeland Mall in Miami, Florida in October 2010.

90.    As a result of AMC's clearance threats as described above, the landlords in each of the cases identified in paragraph 89 were deterred from leasing their spaces to Cobb; Cobb was prevented from entering the film licensing and exhibition markets in those zones; and AMC perpetuated or expanded its monopoly in those markets.

91.    With respect to the space in Dadeland Mall in Miami, Florida, Gerry Lopez (President and CEO of AMC) told Robert M. Cobb (President and CEO of Cobb) that AMC would use "the full weight and power of AMC" to prevent Cobb from opening a CinéBistro there.

92.    AMC's ruthless campaign to prevent Cobb from competing with AMC on the merits prevented Cobb from opening several more CinéBistros every

year since 2009 than it actually did, and will prevent Cobb from opening several more CinéBistros each year in the future.

93.     As alleged, Cobb's theaters offer the same or higher quality movie-going experience per dollar spent than AMC's theaters do.

94.     Therefore, for every lease of which Cobb is deprived not on the merits but as a result of AMC's leveraging its circuit and monopoly power to strong-arm landlords into not leasing to Cobb, consumers are made worse off. They are left with one, often inferior, theater choice, which is no choice at all. AMC's exclusionary campaign has injured, and will continue to injure, Cobb and the consuming public unless enjoined.

95.     As AMC stated in its recent S-1, "there is . . . a scarcity of attractive retail real estate opportunities" for new theaters in desirable metropolitan areas.

96.     In other words, the barriers to entry into desirable geographic zones are already high.

97.     AMC has used and is using its worldwide and national circuit power, and its monopoly power in a substantial number of non-competitive zones—not its superiority on the merits—to raise those barriers even higher and to prevent other exhibitors, including Cobb, from competing for those few scarce real estate

opportunities and, in turn, from competing with AMC for film licenses and customers.

## DAMAGES AND CONTINUING INJURY

98.     AMC has engaged in a continuing and continuous course of conduct with respect to the acts, practices, and conduct in violation of United States and Georgia law alleged herein that has injured competition and Cobb in an amount to be proven at trial and has caused and will continue to cause injury to competition, consumers, the public interest, and the business and property of Cobb unless permanently enjoined.

99.     Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its unlawful conduct and continuing violations of the antitrust laws.

## COUNT I
## CIRCUIT DEALING:
## VIOLATION OF SHERMAN ACT SECTION 1 AND/OR 2

100.    Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

101.    As the second-largest theater circuit in the United States and, when combined with Wanda Cinema Line, the world's largest cinema operator, AMC possesses substantial circuit power.

102.   AMC's anticompetitive conduct described above, over the past 4–5 years and continuing today, done with the predatory intent to deprive the Brookhaven CinéBistro of an opportunity to obtain the supply of films needed for effective competition, constitutes unlawful circuit dealing in violation of Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1 and/or 2, and the long-established rule that films be licensed on a film by film, theater by theater basis without the discriminatory preferences in favor of one or more dominant theater circuits.

103.   Like the formula deals and master agreements declared unlawful in *Paramount*, AMC's policy and practice of using and threatening to use its circuit power to enforce clearances against competing theaters, including Cobb, "eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit" and "are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." 334 U.S. at 154. Like the formula deals and master agreements declared unlawful in *Paramount*, AMC's clearance practices also constitute "a misuse of monopoly power insofar as [they] combine[] the theatres in closed towns with competitive situations." *Id.* at 154–55.

104.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cobb has been injured in its business and

property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

105.   Cobb also is entitled to recover from AMC the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

106.   Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its unlawful conduct and continuing violations of the antitrust laws. Cobb is thus entitled to injunctive relief against AMC.

## COUNT II
## MONOPOLIZATION:
## VIOLATION OF SHERMAN ACT SECTION 2

107.   Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

108.   AMC possesses monopoly power in the markets for film licenses and theater customers in a substantial number of zones, including without limitation in the Buckhead-Brookhaven zone, as demonstrated by AMC's high or monopoly market shares in those markets within those zones, its circuit power, its actual exclusion of competition and control over distributors, and the high barriers to entry into those markets within those zones.

109.   AMC has used its monopoly power to coerce distributors into denying Cobb the opportunity to compete fairly with AMC for film licenses and theater customers and to coerce landlords into not leasing theater space to Cobb, thereby having a direct adverse effect on competition by preventing Cobb from competing with AMC on the merits.

110.   By such acts, practices, and conduct, AMC has directly insulated itself from competition with Cobb for film licenses and theater customers, and has thereby restrained trade in, and willfully maintained or expanded its monopoly power in, markets for film licenses and exhibition, including without limitation in the Buckhead-Brookhaven zone.

111.   AMC's conduct has no pro-competitive benefit or justification. The anticompetitive effects of its behavior outweigh any purported pro-competitive justifications. The public has been deprived of the freedom to choose where to view films.

112.   By its acts, practices, and conduct, over the past 4–5 years and continuing today, AMC has engaged in a course of conduct that amounts to monopolization and/or unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

113.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cobb has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

114.   Cobb also is entitled to recover from AMC the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

115.   Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its unlawful conduct and continuing violations of the antitrust laws. Cobb is thus entitled to injunctive relief against AMC.

**COUNT III**
**ATTEMPTED MONOPOLIZATION:**
**VIOLATION OF SHERMAN ACT SECTION 2**

116.   Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

117.   Through its anticompetitive conduct as alleged above, AMC specifically intended and intends to maintain and expand its monopoly power in markets for film licenses and exhibition, including without limitation in the Buckhead-Brookhaven zone. As evidenced by AMC's high or monopoly market shares in a substantial number of film licensing and exhibition zones throughout

the United States, including the Buckhead-Brookhaven zone, its circuit power, it abuse of market power, its ability to exclude or foreclose competition and control distributors, and the high barriers to entry into the relevant markets, AMC's anticompetitive scheme has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success.

118.   AMC's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

119.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cobb has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

120.   Cobb also is entitled to recover from AMC the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

121.   Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its unlawful conduct and continuing violations of the antitrust laws. Cobb is thus entitled to injunctive relief against AMC.

**COUNT IV**
**EXCLUSIVE DEALING:**
**VIOLATION OF SHERMAN ACT SECTION 1**

122.   Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

123.   AMC possesses monopoly power in the markets for film licenses and theater customers in a substantial number of zones, including without limitation in the Buckhead-Brookhaven zone, as demonstrated by AMC's high or monopoly market shares in those markets within those zones, its circuit power, its actual exclusion of competition and control over distributors, and the high barriers to entry into those markets within those zones.

124.   AMC has used its monopoly power to coerce distributors into entering into agreements with AMC pursuant to which those distributors agree to deny Cobb the opportunity to compete with AMC for film licenses and theater customers.

125.   AMC has used its monopoly power to coerce landlords into entering into agreements with AMC pursuant to which those landlords agree not to lease theater space to Cobb, thereby preventing Cobb from competing with AMC on the merits.

126.   By such acts, practices, and conduct, AMC has directly insulated itself from and foreclosed competition with Cobb for film licenses and theater customers in several zones, including without limitation in the Buckhead-Brookhaven zone.

127.   AMC's conduct in entering into these contracts, combinations, or conspiracies has no pro-competitive benefit or justification. The anticompetitive effects of these agreements outweigh any purported pro-competitive justifications. The public has been deprived of the freedom to choose where to view films.

128.   By its acts, practices, and conduct, including by entering into the agreements described above, over the past 4–5 years and continuing today, AMC has engaged in a course of conduct that amounts to exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cobb has been injured in its business and property by being foreclosed from fair competitive access to markets for film licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

130.   Cobb also is entitled to recover from AMC the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

131.   Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its unlawful conduct and continuing violations of the antitrust laws. Cobb is thus entitled to injunctive relief against AMC.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

132.   Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

133.   Cobb enjoyed and continues to enjoy relationships with patrons of its theaters that include future economic benefits to Cobb from continuing patronage to view a wide variety of films. At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cobb and knew that this expectancy constituted a valuable business asset and form of revenue for Cobb.

134.   Cobb enjoyed and continues to enjoy relationships with distributors that include future economic benefits to Cobb from the continued fair competitive access to the licensing of films. At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cobb and knew that this expectancy constituted a valuable business asset and form of revenue for Cobb.

135.   Cobb enjoyed and continues to enjoy relationships with landlords that include future economic benefits to Cobb from the continued fair competitive

access to leased space. At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cobb and knew that this expectancy constituted a valuable business asset and form of revenue for Cobb.

136.   AMC acted improperly and without privilege in its tortious interference with Cobb's business relationships with film distributors, landlords, and patrons.

137.   AMC's tortious interference with Cobb's business relationships include AMC's targeting of Cobb for exclusion from markets for film licenses, film exhibition, and theater space.

138.   AMC purposely and with malice and specific intent to injure Cobb disrupted and interfered with, and continues to disrupt and interfere with, Cobb's economic relationships with its patrons, film distributors, and landlords, which relationships carry with them a future economic benefit to Cobb.

139.   AMC purposely and with malice and specific intent to injure Cobb induced distributors not to enter into licensing agreements with Cobb and not to enter into or continue a business relationship with Cobb.

140.   By depriving Cobb of licenses for films to exhibit to patrons, AMC purposely and with malice and specific intent to injure Cobb induced patrons not to

buy film tickets from Cobb, not to patronize its theater, and not to enter into or continue a business relationship with Cobb.

141.   By threatening to impose clearances, AMC purposely and with malice and specific intent to injure Cobb induced landlords not to lease theater space to Cobb and not to enter into or continue a business relationship with Cobb.

142.   As a direct and proximate result of AMC's wrongful actions, Cobb has been injured and continues to suffer financial injury.

143.   As a direct and proximate result of AMC's wrongful conduct, Cobb has been foreclosed from competition on the merits and has lost revenue and profit that it would have otherwise earned but for AMC's conduct. Cobb is unable to lease theater space and license and exhibit films on a fair competitive basis and to offer other related goods and services to prospective patrons, and is consequently unable to obtain the economic benefits of opening new theaters and of increased ticket and concession sales.

144.   In doing the things alleged herein, AMC has acted willfully, maliciously, oppressively, with full knowledge of the adverse effects of its actions on Cobb, with willful and deliberate disregard of the consequences to Cobb, and with specific intent. As such, Cobb seeks exemplary and punitive damages in an amount to be proven at trial pursuant to O.C.G.A. § 51-12-5.1.

145.   Cobb is entitled to recover expenses of litigation from AMC pursuant to O.C.G.A. § 13-6-11 because AMC has acted in bad faith, has been stubbornly litigious, and/or has caused Cobb unnecessary trouble and expense.

146.   Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC from its tortious conduct. Cobb is thus entitled to injunctive relief against AMC.

**COUNT VI**
**CONTRACT IN RESTRAINT OF TRADE:**
**VIOLATION OF O.C.G.A. § 13-8-2 AND**
**GEORGIA CONSTITUTION ARTICLE 3, SECTION 6, PARAGRAPH 5**

147.   Cobb re-alleges the allegations contained in paragraphs 1 through 99 above.

148.   As alleged above, AMC has engaged and continues to engage in exclusive contracts that defeat and lessen competition, encourage monopoly, and restrain trade in markets for film licenses and exhibition.

149.   AMC has engaged and continues to engage in such exclusive contracts with the specific intent and purpose to restrain trade in the markets for film licenses and exhibition.

150.   AMC's actions thus violate Article 3, Section 6, Paragraph 5 of the Georgia Constitution and O.C.G.A. § 13-8-2.

151.   AMC's contracts in restraint of trade have directly and proximately caused and continue to cause injury to Cobb in an amount to be proven at trial, including without limitation by preventing Cobb from entering into competitive film licensing contracts with distributors, from opening new theaters, and from attracting patrons. Cobb is entitled to compensatory damages for these injuries.

152.   Cobb is entitled to recover expenses of litigation from AMC pursuant to O.C.G.A. § 13-6-11 because AMC has acted in bad faith, has been stubbornly litigious, and has caused Cobb unnecessary trouble and expense.

153.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cobb will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins AMC's continuing violations. Cobb is thus entitled to injunctive relief against AMC.

## PRAYER FOR RELIEF

WHEREFORE, Cobb requests that the Court enter judgment and grant relief as follows:

1.   Adjudge AMC to have violated and to be in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

2.    Adjudge AMC to have committed and to be continuing to commit the tort of interference with business relations and to have done so willfully, with malice, fraud, wantonness, oppression, or entire want of care, with specific intent to cause harm to Cobb, and in bad faith.

3.    Adjudge AMC to have violated and to be in continuing violation of Article 3, Section 6, Paragraph 5 of the Georgia Constitution and O.C.G.A. § 13-8-2.

4.    Enter judgment for Cobb against AMC for three times the amount of damages sustained by Cobb, together with the expenses of litigation and cost of this action, including a reasonable attorney's fee, and such other relief as appropriate.

5.    Pursuant to Federal Rule of Civil Procedure 65, enjoin AMC from engaging in further anticompetitive and unlawful conduct, including without limitation by enjoining AMC from demanding or requesting clearances over competing theaters and from threatening landlords that it will request clearances over a competing theater if the landlord leases space to the competing theater.

6.    Grant such other equitable relief, including disgorgement of all unlawfully obtained profits that the Court finds just and proper to address and to prevent recurrence of AMC's unlawful conduct.

7.    Grant such other and further equitable or legal relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Cobb hereby demands a jury trial as to all issues triable to the jury.

Respectfully submitted, this 22nd day of January, 2014.

FELLOWS LABRIOLA LLP

s/Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
Megan C. Haley
Georgia Bar No. 113406
Suite 2300, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200 telephone
(404) 586-9201 facsimile
hfellows@fellab.com
mhaley@fellab.com

Thomas L. Boeder
Catherine S. Simonsen
PERKINS COIE
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000 telephone
(206) 359-9000 facsimile
TBoeder@perkinscoie.com
CSimonsen@perkinscoie.com
[*Pro Hac Vice* Applications to Follow]
*Attorneys for Plaintiffs*