IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC., <br><br> Defendants. | CIVIL ACTION FILE NO. <br><br><br> 1:14-CV-00182-SCJ |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, Cobb Theatres III, LLC and Cobb Theatres IV, LLC (together, "Cobb") hereby oppose Defendants AMC Entertainment Holdings, Inc., AMC Entertainment Inc., and American Multi-Cinema, Inc.'s (together, AMC's) motion to dismiss Cobb's Complaint.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

ARGUMENT AND AUTHORITIES....................................................................2

I.     Motion to Dismiss Standard ..................................................................3

II.    Cobb Adequately Alleges that AMC Has Monopolized
and Attempted to Monopolize Markets for Film Licenses
and Theater Patrons ...............................................................................4

     A.    Buckhead-Brookhaven Is a Plausible Geographic
Market ................................................................................4

     B.    Cobb Pleads Specific Facts Supporting the
Exclusion of Home-Viewing from the Relevant
Product Market.....................................................................7

     C.    AMC Possesses Monopoly Power in the Relevant
Markets.................................................................................8

     D.    AMC's Exclusionary Conduct Has Harmed
Competition........................................................................11

     E.    Clearances Are Not "Procompetitive as a Matter of
Law"...................................................................................15

III.    Cobb States a Claim for Circuit Dealing............................................18

IV.    AMC's Clearance Exclusivity Agreements Violate the
Sherman Act ........................................................................................22

V.    Cobb Adequately Pleads Antitrust Injury ..........................................24

VI.    Cobb States Viable State-Law Claims ...............................................25

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................3

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ...........................................8

*Belanger v. Salvation Army*,
   556 F.3d 1153 (11th Cir. 2009) ...........................................3

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................3, 22

*Bolinger v. First Multiple Listing Service*, *Inc.*,
   838 F. Supp. 2d 1340 (N.D. Ga. 2012)...............................23

*Foundation for Interior Design Education Research v. Savannah*
   *College of Art & Design*, 244 F.3d 521 (6th Cir. 2001) .......6

*Griffiths v. Blue Cross & Blue Shield of Alanta*,
   147 F. Supp. 2d 1203 (N.D. Ala. 2001)...............................4

*Jacobs v. Tempur-Pedic International, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ...............................passim

*L.A. Draper & Son v. Wheelabrator-Frye, Inc.*,
   735 F.2d 414 (11th Cir. 1984) .....................................5, 6, 9

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...............................................13, 14, 16, 17

*Lombard's, Inc. v. Prince Manufacturing, Inc.*,
   753 F.2d 974 (11th Cir. 1985) .............................................23

*Morris Communications Corp. v. PGA Tour, Inc.*,
   364 F.3d 1288 (11th Cir. 2004) ...............................8, 11, 15

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978)..............................................................15

# TABLE OF CONTENTS
## (continued)

**Page**

*Palmyra Park Hospital Inc. v. Phoebe Putney Memorial Hospital*,
 604 F.3d 1291 (11th Cir. 2010) ......................................................................25

*Reading International, Inc. v. Oaktree Capital Management LLC*,
 No. 03 Civ.1895 (PAC), 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007)............13, 18

*Schine Chain Theatres v. United States*,
 334 U.S. 110 (1948), *overruled on other grounds*, *Copperweld
 Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).....................17, 18, 19

*Spanish Broadcasting System of Florida, Inc. v. Clear Channel
 Communications, Inc.*,
 376 F.3d 1065 (11th Cir. 2004) ......................................................................13

*Speaker v. U.S. Department of Health & Human Services Centers for
 Disease Control & Prevention*,
 623 F.3d 1371 (11th Cir. 2010) ......................................................................22

*Spectrum Sports, Inc. v. McQuillan*,
 506 U.S. 447 (1993)........................................................................................4

*T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc.*,
 931 F.2d 816 (11th Cir. 1991) ........................................................................4

*Theee Movies of Tarzana v. Pacific Theatres, Inc.*,
 828 F.2d 1395 (9th Cir. 1987) ........................................................................16

*Todorov v. DCH Healthcare Authority*,
 921 F.2d 1438 (11th Cir. 1991) ......................................................................24

*U.S. Ring Binder L.P. v. World Wide Stationery Manufacturing Co.*,
 804 F. Supp. 2d 588 (N.D. Ohio 2011) ...........................................................10

*United States v. Griffith*,
 334 U.S. 100 (1948), *overruled on other grounds*, *Copperweld
 Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)............................18, 21

*United States v. Microsoft Corp.*,
 253 F.3d 34 (D.C. Cir. 2001)........................................................................4, 11

*United States v. Paramount Pictures*,
 334 U.S. 131 (1948)..................................................................................18, 21

## TABLE OF CONTENTS
### (continued)

**Page**

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001) ...................................................................10

CONSTITUTIONAL PROVISIONS AND STATUTES

15 U.S.C. § 1 .............................................................................................3

15 U.S.C. § 2 .............................................................................................3

Ga. Const. art. 3, § 6, ¶ V .................................................................3, 25

O.C.G.A. § 13-8-2...............................................................................3, 25

RULES

Fed. R. Civ. P. 8(a)............................................................................3, 8

Fed. R. Evid. 201(b)...............................................................................6

OTHER AUTHORITIES

8 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An
Analysis of Antitrust Principles and Their Application (3d ed.
2013) ....................................................................................................11

## INTRODUCTION

Cobb, an independent movie theater circuit, has won over the movie-going public in cities across the country with its upscale, adults-only, dinner-and-a-movie CinéBistros. Thanks to Cobb, consumers in several cities now have a choice between viewing a new release in an old, outdated, harshly-lit theater offering limited food and beverage choices, and replete with loud children and young people, and viewing those films at a Cobb CinéBistro, where they enjoy reserved seating, elegant and sophisticated auditoriums and lounges, high-back leather rocking chairs, in-theater, full-service dining prior to the start of the film, a freshly prepared and seasonal American bistro menu and full bar, 100% digital cinema and theater sound technology, 3-D capabilities, and an adults-only environment.

Seeking to offer that same choice to the movie-going public of Buckhead and Brookhaven in Atlanta, Georgia, Cobb opened the CinéBistro at Town Brookhaven in the fall of 2011 a little under three miles north of AMC's Phipps Plaza 14 and Fork & Screen Buckhead. Cobb's competition was not welcome. AMC feared that Cobb's innovative dinner-and-a-movie concept would draw its customers away. So it flexed its monopoly power in the Buckhead-Brookhaven zone and its circuit power as the second-largest theater circuit in the country. It forced distributors into granting it preferential film licensing treatment that has

deprived Cobb's Brookhaven CinéBistro of fair, competitive access to film and has interfered with its ability to compete with AMC's Buckhead theaters for patrons.

AMC's conduct is illegal under the U.S. antitrust laws. A monopolist must compete with its smaller, more innovative rivals on the merits. When it abuses its monopoly power to erect artificial barriers to competition, it violates Section 2 of the Sherman Antitrust Act. When it forces its suppliers into agreeing not to provide its competitors with the inputs they need to compete, it violates Section 1 of the Sherman Act. When it leverages its monopoly power in a substantial number of non-competitive markets to obtain blanket clearance agreements from distributors that give it unfair advantages in markets in which it faces competition, it violates the Sherman Act's long-established prohibition against circuit dealing.

AMC has done all of these things. The biggest losers are the movie-going public. They have borne the brunt of AMC's innovation-stifling, quality-reducing, patently anticompetitive conduct—not only in Buckhead-Brookhaven, but in cities across the country, where AMC has erected entry barriers that have precluded rival theaters from even attempting to compete with it. Cobb's Complaint pleads all of this with factual specificity. AMC's motion should be denied.

## ARGUMENT AND AUTHORITIES

The Sherman Act declares illegal "[e]very contract, combination . . . , or

conspiracy, in restraint of trade or commerce," and the "monopoliz[ation], or attempt to monopolize, . . . any part of the trade or commerce among the several States." 15 U.S.C. §§ 1 & 2; *see also* Ga. Const. art. 3, § 6, ¶ V; O.C.G.A. § 13-8-2. Cobb alleges that AMC has violated the Sherman Act and Georgia law by monopolizing and attempting to monopolize markets for film licenses and theater customers by entering into exclusive agreements that foreclose competition in those markets and engaging in *per se* unlawful circuit dealing. Cobb pleads each element of its claims with particularity and puts AMC on notice of the allegations lodged against it. Cobb has therefore sufficiently stated claims for relief.

## I.    Motion to Dismiss Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and indications of alteration omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face"). In deciding a motion to dismiss, the court must "accept[] the allegations . . . as true and constru[e] them in the light most favorable to the plaintiff." *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009).

## II. Cobb Adequately Alleges that AMC Has Monopolized and Attempted to Monopolize Markets for Film Licenses and Theater Patrons

A plaintiff pleads monopolization by pleading (1) the possession of monopoly power in the relevant market and (2) the "acqui[sition] or maint[enance] . . . [of] a monopoly by engaging in exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (quotation marks omitted). Attempted monopolization requires a showing of (1) "predatory or anticompetitive conduct," (2) "dangerous probability of achieving monopoly power," and (3) "a specific intent to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

### A. Buckhead-Brookhaven Is a Plausible Geographic Market

"[A]ntitrust plaintiffs . . . must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). "[T]he relevant market . . . is essentially a question of fact, . . . which may be properly developed . . . through the discovery process." *Griffiths v. Blue Cross & Blue Shield of Ala.*, 147 F. Supp. 2d 1203, 1214 (N.D. Ala. 2001); *see also T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991) ("the relevant market is essentially a question of fact"). The relevant

geographic market is "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded"; "such economic and physical barriers to expansion as transportation costs[,] . . . customer convenience and preference," and "[t]he location . . . of other . . . distributors are . . . essential in determining the relevant geographic market." *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984) (quotation marks omitted).

Cobb alleges that the relevant geographic market is the Buckhead-Brookhaven zone because "[m]oviegoers who reside in or around Buckhead and Brookhaven . . . are reluctant to travel significant distances outside of this zone to attend a film exhibition except in unusual circumstances . . . ." Compl. ¶ 39. In other words, Cobb alleges that exhibitors "within the area are making price and output decisions protected from the need to take account of sellers outside the area"—since customers living in the zone do not normally treat the exhibitors outside it as substitutes for exhibitors within it. *L.A. Draper*, 735 F.2d at 423. Further, Cobb alleges with factual specificity why that is the case: The zone is characterized by "heavy traffic congestion" and "significant population density," making it difficult for residents within the zone to travel even a few miles outside the zone to view a film. Compl. ¶ 39. That is, Cobb alleges that "transportation costs" (*i.e.*, travel time) and "customer convenience and preference" are "economic

and physical barriers" that "limit . . . the ability of purchasers to obtain the product

from suppliers outside the geographic area." *L.A. Draper*, 735 F.2d at 423.[1]

Evidently realizing that Cobb's Complaint adequately pleads a geographic

market, AMC quickly moves on to matters *outside* the Complaint to challenge

Cobb's market definition. As explained in Cobb's Notice of Objection and Motion

to Strike, filed contemporaneously herewith, the Court cannot consider these

materials because they are not subject to judicial notice.[2]  Cobb has adequately

pled that economic and physical barriers prevent theaters other than Cobb's

Brookhaven CinéBistro from competing with AMC's Buckhead theaters. That is

sufficient at the pleading stage. *See Found. for Interior Design Educ. Research v.*

*Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market

[1] According to AMC, "[i]ndustry-identified film zones do not purport to identify the geographic scope of an antitrust market" (Motion at 20 n.12). Cobb disagrees, but distributors' designation of Buckhead-Brookhaven as a film licensing zone at least *supports* Cobb's geographic market definition, and as discussed, Cobb does not rely exclusively on that designation to justify its market definition.

[2] In the alternative, if this Court were to take judicial notice of Google Maps' purported estimates of the driving time between Buckhead-Brookhaven and the farther-afield theaters identified by AMC (which AMC argues fall within the relevant geographic market), then it must also take judicial notice of other facts that are "subject to [the same level of] reasonable dispute." Fed. R. Evid. 201(b). Specifically, Google's "Movies" feature provides that one of these theaters is an art-house theater that does not offer the product at issue in this case, and while the other three do, AMC's Buckhead theaters play day and date with—*i.e.*, do not demand clearances over—these theaters. *See* Ex. A. AMC admits that it seeks clearances only over "theatres [that] are in substantial competition" with it (Motion at 11). It follows that AMC's only competitor is Cobb's Brookhaven CinéBistro.

definition is a highly fact-based analysis that generally requires discovery.").

**B.    Cobb Pleads Specific Facts Supporting the Exclusion of Home-Viewing from the Relevant Product Market**

The relevant product market is defined in terms of "reasonably interchangeable" goods or services. *Jacobs*, 626 F.3d at 1338. Cobb alleges that the relevant product markets are (1) the market to license desirable first run, feature-length motion pictures for theatrical exhibition to the public ("films") and (2) the market to exhibit such films to patrons. Compl. ¶¶ 1, 41, 49. AMC appears not to have read the section of the Complaint in which Cobb alleges why home-viewing of motion pictures and other forms of entertainment are not reasonable substitutes for viewing films in theaters (*id.* ¶¶ 18-19), for it claims that "[t]here are no allegations of cross-elasticity of demand in the Complaint that would support this product market" (Mot. at 15). But the Complaint specifically alleges:

> 18.    When consumers watch motion pictures in their homes, they typically lose several advantages of the theater experience, including the size of screen, the sophistication of sound systems, the opportunity to watch in 3-D, and the social experience of viewing a film with other patrons. Additionally, the most popular, newly released or "first run" motion pictures (films) are not available for home viewing.

> 19.    Differences in the pricing of various forms of entertainment also reflect their lack of substitutability in the eyes of consumers. . . . Renting a motion picture

> DVD for home viewing is usually significantly less expensive than viewing a film in a theater. . . .
>
> 23. . . . [A] modern motion picture's theatrical exhibition life generally is no more than a few weeks, approximately 90–120 days after which it is released in other entertainment formats (*e.g.*, DVD and pay-per-view television).

Cobb alleges specific facts rendering its product markets more than plausible. Rule 8(a) requires nothing more.

### C.     AMC Possesses Monopoly Power in the Relevant Markets

Monopoly power is "the power to control prices in or to exclude competition from the relevant market." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293-94 (11th Cir. 2004). Market share "is frequently used in litigation as a surrogate for market power," and high entry barriers reinforce the inference of monopoly power from high market share. *Jacobs*, 626 F.3d at 1339-40. Cobb adequately pleads AMC's market power. First, Cobb estimates AMC's market share in both markets as 69%, as it controls 69% of the film theater seats in the zone. Compl. ¶¶ 43, 51. Furthermore, Cobb alleges that entry barriers are high: "'[T]here is . . . a scarcity of attractive retail real estate opportunities' for new theaters in desirable metropolitan areas." *Id.* ¶¶ 95-96. Thus, "it [is] reasonable to presume the existence of [AMC's monopoly] power . . . ." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("reasonable to presume the existence of

[monopoly] power from a showing that the defendant's share of a well-defined market protected by sufficient entry barriers . . . exceed[s] 70 or 75 percent"). Cobb further alleges that AMC's circuit power renders its power to raise prices or exclude rivals in the relevant markets even greater than its high market share and the high entry barriers suggest: AMC "operates a substantial number of theaters across the United States in non-competitive zones," and it wields that circuit power to secure preferential treatment over competing theaters like Cobb's. Compl. ¶¶ 28, 1, 33, 44, 52, 77, 85, 109. The fact that AMC's clearance demands are honored by distributors—that AMC actually succeeds in raising its rivals' costs—is yet a further indication of AMC's monopoly power.

AMC relies primarily on its unavailing argument that Cobb has defined the market too narrowly to argue that AMC lacks monopoly power in the relevant markets. *See* Mot. at 2, 16, 18-19. Because Cobb adequately pleads the relevant markets, this argument fails. AMC then advances the convoluted argument that by defining the relevant geographic market as the case law requires—as "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded," *L.A. Draper*, 735 F.2d at 423—Cobb has somehow conceded that free competition between Cobb's Brookhaven CinéBistro and AMC's Buckhead theaters exists, and so AMC cannot possibly have monopoly

power in that market (Mot. at 18, 20-21).

AMC's argument is absurd. The relevant geographic market inquiry asks which sellers are reasonably accessible to purchasers such that, in the *absence* of any artificial barriers to competition, purchasers will substitute one seller's product for another's if the latter raises his price or reduces the quality of his product. The reason Cobb's Brookhaven CinéBistro and AMC's Buckhead theaters are in the same geographic market is that, absent AMC's anticompetitive clearances, consumers in that market would substitute Cobb's Brookhaven CinéBistro for AMC's Buckhead theaters. That is not the same thing as alleging that free competition does, in fact, exist, or that no supplier has monopoly power. Cobb clearly and repeatedly alleges that AMC's exclusionary behavior inhibits competition in the Buckhead-Brookhaven zone. *See, e.g.*, Compl. ¶¶ 1, 75, 109.[3]

Finally, AMC obliquely suggests that Cobb's monopolization claim is a "monopoly leveraging" claim—a "claim . . . based on using or leveraging monopoly power from one purported market to gain advantage in another," Mot. at 6 n.3, "even without an attempt to monopolize the second market." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001). As AMC

---

[3] Thus, unlike the plaintiff in the inapposite case of *U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*, 804 F. Supp. 2d 588, 596 (N.D. Ohio 2011), nowhere does Cobb allege that the market is "sharply competitive" such that "the allegation that monopoly power does or could exist in the [relevant] market is not plausible."

explains, a plaintiff asserting a monopoly leveraging claim must show "monopoly or market power in a properly defined market that is being used for leverage." Mot. at 6 n.3. But Cobb's monopolization claim is a pure monopolization claim—not a monopoly leveraging claim. As long as Cobb alleges—as it does—that AMC has monopoly power in the relevant markets and has anticompetitively maintained or expanded that power, it is not required to plead AMC's monopoly power in any other "leveraging" market.

### D.   AMC's Exclusionary Conduct Has Harmed Competition

In order for an exclusionary act to satisfy the conduct prong of the monopolization offense, "it must harm the competitive *process* and thereby harm consumers." *Morris*, 364 F.3d at 1294 (quoting *Microsoft,* 253 F.3d at 58). A plaintiff pleads such harm by pleading either actual or potential harm to competition. *Jacobs*, 626 F.3d at 1339. Actual anticompetitive effects resulting from injury to competition "include, but are not limited to, reduction of output, increase in price, or deterioration in quality. . . . Higher prices alone are not the 'epitome' of anticompetitive harm . . . . Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act." *Id.*; *see* 8 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1800 (3d ed. 2013) ("[T]he question of

impact on competition is addressed . . . by considering the extent to which customer choice is restrained.")

Cobb alleges that AMC's clearance agreements have caused *actual* harm to competition—specifically, "a reduction in the overall quality of movie theaters offered to the public." Compl. ¶ 1; *see id.* ¶¶ 68 (same), 38 & 48 (detailing the "[a]menities at the Brookhaven CinéBistro" that render its quality "superior" to that of AMC's Buckhead theaters), 46-47 & 78 (Cobb's Brookhaven CinéBistro creates a "considerably more pleasant and enjoyable movie-going experience than either of AMC's Buckhead theaters" and offers a "higher quality movie-going experience per dollar spent than AMC's Buckhead theaters do"), 94. In other words, Cobb has introduced a substantial quality innovation to the industry that patrons love: an upscale, adults-only, dinner-and-a-movie experience. These patrons prefer to view a film at Cobb's Brookhaven CinéBistro over AMC's Buckhead theaters, and they would if they could. But they can't. AMC's clearances prevent them from enjoying the fruits of Cobb's quality innovation and force them to see films at their second- or third-choice theaters. Compl. ¶ 79. That is, unmistakably, an anticompetitive effect. *See Jacobs*, 626 F.3d at 1339.

AMC cites to an unpublished, out-of-circuit district court case for the incorrect proposition that "the mere possibility that a consumer might have to see

his or her first choice movie at his or her second choice theatre . . . does not mean that there has been an actionable harm to consumer choice or competition" (Motion at 13 (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ.1895 (PAC), 2007 WL 39301, at *14 (S.D.N.Y. Jan. 8, 2007))). *Reading* confuses antitrust law's willingness to sacrifice intrabrand competition for an increase in interbrand competition with the false proposition that suppression of intrabrand competition can never constitute harm to competition. Competition at the "retailer" (here, the theater) level is still competition, and when a dominant retailer employs exclusionary tactics to suppress such competition without providing an offsetting, procompetitive benefit, it violates the antitrust laws. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).

Cobb also pleads that AMC's anticompetitive conduct has the *potential* to harm competition. First, as established, Cobb adequately alleges that AMC has monopoly power. *See* § II.C, *supra*. Second, Cobb adequately alleges that AMC has engaged in "inherent[ly] anticompetitive" conduct that, because of AMC's monopoly power, is likely to harm competition. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004). The Complaint alleges that AMC's clearances are inherently anticompetitive because they cannot be justified by "the expectation that [AMC] w[ill] pay for substantial

extra promotion or advertising [of a distributor's films] . . . if it ha[s] 'clearance' over [Cobb's Brookhaven CinéBistro]" because "such substantial promotional expenditures . . . are rare." Compl. ¶ 30. Indeed, if AMC had demanded the clearances at issue in this case as compensation for promoting certain distributors' films over others', and to prevent Cobb from "free-riding" off of those promotional efforts, *AMC would not have demanded blanket clearances from every major distributor*. Cobb further alleges that "it would be in the independent best economic interest of the distributors to license to the Brookhaven CinéBistro and AMC's Buckhead theaters for day and date play," *id.* ¶ 63, as doing so would allow them to capture the total grossing potential of the entire geographic market. Yet the distributors have imposed clearances that operate precisely *against* these economic interests, at AMC's behest. This again suggests that the clearances are "inherent[ly] anticompetitive" tools being enforced by a monopolist to exclude its rivals—not reasonable limitations on intrabrand competition that stimulate interbrand competition. Indeed, the U.S. Supreme Court has made clear that such restraints may be unreasonable where "a powerful . . . retailer . . . request[s] [them] to forestall innovation": "A manufacturer might consider it has little choice but to accommodate the retailer's demands for [such] restraints if the manufacturer believes it needs access to the retailer's distribution network." *Leegin*, 551 U.S. at

893-94. That is precisely what Cobb alleges here. Cobb has alleged more than mere "[h]arm to one or more competitors." *Morris*, 364 F.3d at 1294. Cobb has plausibly and with factual specificity alleged harm to competition.

### E.   Clearances Are Not "Procompetitive as a Matter of Law"

Remarkably, AMC insists that the clearances several distributors have imposed against Cobb's Brookhaven CinéBistro at AMC's behest are "[p]rocompetitive as a [m]atter of [l]aw" because they "ensure that [AMC's Buckhead] theatre[s]'[] income from a film will not be greatly diminished because the film is also being shown at [Cobb's] nearby competing theatre" (Mot. at 10 (quotation marks omitted); *see id.* at 17 & n. 10 (same)). Apparently—according to AMC—dominant film exhibitors must be permitted to impose clearances over smaller, more innovative rivals so that they can be protected from what they view as the evils of competition. The courts "ha[ve] never accepted such an argument. . . . [The defendant cannot] impose[] [its own] views of the costs and benefits of competition on the entire marketplace. . . . [The invocation of] the potential threat that competition poses to the public . . . is nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 694-95 (1978).

As explained in the Complaint, the original justification for clearances—in

the early 1900s—was to incentivize the licensed exhibitor to market the distributor's film on its behalf. Compl. ¶ 30. To prevent a nearby theater from free-riding off of the promotional expenditures of the licensed exhibitor, the distributor would agree to license the promoted films exclusively to the promoter. While intrabrand competition was suppressed, there was at least an argument that interbrand competition was strengthened because *each* distributor used clearances as a tool for incentivizing the promotion of its own films. *See Theee Movies of Tarzana v. Pac. Theatres*, Inc., 828 F.2d 1395, 1399 (9th Cir. 1987); *see generally Leegin*, 551 U.S. at 890-91. In addition, duplication of film reel used to be expensive. By limiting the number of required prints, distributors significantly cut costs. *See Theee Movies*, 828 F.3d at 1399-1400.

Fast forward 100 years. Distributors no longer rely on exhibitors to promote their films at the local level, instead running national advertising campaigns. *See* Compl. ¶¶ 26, 30. Moreover, film reels are a relic of the past—distribution is now digital, with the marginal cost of film transmission to each additional theater practically nil. Thus, distributors now pursue "a 'wide release' strategy for the majority of their films, whereby they try to earn as much revenue as possible in the first several weeks after release by showing the film on as many screens and in as many theaters as possible." *Id.* ¶ 31.

In this modernized age of film distribution, clearances—particularly blanket clearances by a dominant circuit over most or all first-run films licensed by several distributors in a competitive film licensing zone—serve no procompetitive purpose. They severely restrict intrabrand competition while providing virtually no cost savings to distributors and doing absolutely nothing to enhance interbrand competition. Clearances are now used by one set of players for one purpose only: by dominant exhibitors like AMC, for the purpose of excluding their smaller and more innovative rivals from the market, insulating themselves from competition, and maintaining and expanding their monopolies. That is precisely how AMC has been employing clearances in Buckhead-Brookhaven for the last two and a half years. Such conduct is illegal. *See Leegin*, 551 U.S. at 894-95.[4]

Because Cobb has adequately pled plausible relevant markets, AMC's monopoly power in those markets, harm to competition in those markets, and AMC's specific intent to monopolize (Compl. ¶ 117), Cobb has adequately pled monopolization and attempted monopolization of the relevant markets.

---

[4] Even under the old film distribution model, clearances were never—contrary to AMC's claims—treated by courts as "[p]rocompetitive as a [m]atter of [l]aw" (Motion at 10). As early as 1948, the U.S. Supreme Court made clear that "any clearance . . . obtained . . . [as] the product of the exercise of monopoly power" "would be unlawful." *Schine Chain Theatres v. United States*, 334 U.S. 110, 124 (1948), *overruled on other grounds*, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

### III.    Cobb States a Claim for Circuit Dealing

Cobb also adequately alleges that AMC has engaged in a course of conduct amounting to circuit dealing, a *per se* violation of the Sherman Act. *See Reading*, 2007 WL 39301, at *7 (citing *United States v. Paramount Pictures*, 334 U.S. 131, 154-55 (1948); *United States v. Griffith*, 334 U.S. 100, 107-08 (1948), *overruled on other grounds*, *Copperweld*, 467 U.S. 752; *Schine*, 334 U.S. at 116-18). Circuit dealing is "the pooling of the purchasing power of an entire circuit in bidding for films"—the "misuse [by a dominant exhibitor] of [his] monopoly power" in "his closed or monopoly towns" to secure from "distributors . . . exclusive film rights in the towns where he has competitors." *Paramount*, 334 U.S. at 154-55; *Griffith*, 334 U.S. at 108. Circuit dealing is illegal both because it constitutes an abuse of monopoly power and because it "eliminate[s] the possibility of bidding for films theatre by theatre" and film by film and "[i]n that way . . . eliminate[s] the opportunity for the small competitor to obtain the choice first runs, and put[s] a premium on the size of the circuit." *Paramount*, 334 U.S. at 155.

For example, in *Schine*, Schine Chain Theatres "pool[ed] [its] entire circuit buying power in the negotiation of films from the distributors so as to combine its closed and open towns," and thereby "got advantages for itself and imposed restrictions on its competitors which otherwise would not have been possible." 334

U.S. at 114. "[D]istributors granted certain favors to Schine which were withheld from Schine's competitors, e.g., giving Schine the first run" and "refusing at times second runs to Schine's competitors." *Id.* The U.S. Supreme Court affirmed the district court's finding that this course of conduct violated the Sherman Act: "Deprivation of competitors of first-and second-run pictures" by "combining the buying power of the open and closed towns" was "arbitrary in the sense that it was the product of monopoly power, not of competitive forces." *Id.* at 117.

Cobb adequately alleges that AMC has engaged in circuit dealing. First, Cobb alleges that AMC, like Schine, "operates a substantial number of theaters across the United States in non-competitive zones" in which it is "the monopolist exhibitor" and that AMC "derive[s] substantial market power from [its] ability to provide numerous exhibition locations or runs simultaneously to distributors for the wide release of a film, including locations in non-competitive zones where a distributor has no other alternative exhibitor to play a film." Compl. ¶¶ 28, 32; *see id.* ¶¶ 11 ("AMC is the second-largest theater circuit in the United States"), 13 ("world's largest cinema operator"). Second, AMC has wielded that circuit power to maintain its monopoly in closed towns, to maintain or expand its monopoly power in competitive markets, and generally to gain unfair advantages and preferential treatment. Compl. ¶¶ 1, 57, 62, 72, 77, 85-91, 97, 100-106. Perhaps the

most blatant example of this is the threat made by Gerry Lopez, President and CEO of AMC, that "AMC would use 'the full weight and power of AMC' to prevent Cobb from opening a CinéBistro" in Dadeland Mall in Miami, Florida, near AMC's existing theater. Compl. ¶¶ 87-91. Indeed, Cobb alleges a pattern of conduct on the part of AMC of going from town to town across the United States, threatening to use the "full weight and power" of its circuit to crush any competing theater to whom landlords might grant a lease. *Id.* Thus, AMC's empty claim (Mot. at 9) that "there are no facts alleged supporting or even suggesting that AMC made any such threat" to invoke its circuit power to obtain preferential treatment ignores the Complaint's plain allegations.

Moreover, as the Complaint alleges, the letter AMC sent to all of the major distributors before Cobb's Brookhaven CinéBistro opened, stating that "our AMC PHIPPS 14 and . . . our AMC FORK & SCREEN BUCKHEAD . . . will not play day-and-date" with Cobb's Brookhaven CinéBistro, operated as "a demand that distributors . . . refuse to license certain films to Cobb's Brookhaven CinéBistro or else risk being denied the grossing potential of AMC's Buckhead theaters and, *implicitly, some or all of the theaters in its entire circuit*." Compl. ¶¶ 58-59 (emphasis added). AMC argues (Mot. at 9) that this letter is not evidence of circuit dealing, since AMC was not so legally naïve as to commit to writing that it would

withhold its closed-town business from the distributors if they did not honor its clearance demands in Buckhead-Brookhaven. But a dominant exhibitor "need not be [so] crass . . . in order to make his monopoly power effective in his competitive situations." *Griffith*, 334 U.S. at 108 (dominant exhibitor need not "make[] [an explicit] threat to withhold the business of his closed or monopoly towns unless the distributors give him the exclusive film rights in the towns where he has competitors" to be held to have engaged in circuit dealing). Drawing all inferences in favor of Cobb, and considering this letter evidence along with AMC's "weight and power" threat and its pattern of using that weight and power to prevent new entrants from competing with it, Cobb has more than adequately alleged a course of conduct by AMC to leverage its monopoly position in a substantial number of closed towns to gain preferential licensing agreements from distributors in competitive towns, to exclude competitors, and ultimately to deprive customers of a higher-quality movie-going experience.[5]

AMC points out that "the Complaint . . . does not allege . . . that AMC refused to exhibit th[e] [few] films [the distributors *have* licensed to Cobb] at any

---

[5] Moreover, AMC's clearance-demand letter is *direct* evidence that it does not bid for films on a theater by theater, film by film basis, as the law requires in order to avoid a finding of circuit dealing. *See Paramount*, 334 U.S. at 154-55. AMC admitted in its letter that its demand for preferential film licensing treatment was backed by the *combined* power it derives from the *two* theaters it operates in the relevant market. That is not theater-by-theater negotiation. *See* Compl. ¶ 72.

other theater(s) in the AMC circuit" (Mot. at 9 n.5), as if that were a necessary condition for a viable circuit dealing claim. But the second-largest theater chain in the country has many tools at its disposal for punishing distributors that give its rivals fair, competitive access to film. Refusal to play the very film a distributor has licensed to one of its rivals is only one of them. In any event, one wonders how Cobb would have such evidence without the benefit of discovery. AMC appears to have forgotten that a plaintiff is not required to "prove [its] case on the pleadings." *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1386 (11th Cir. 2010). It "must merely provide enough factual material to raise a reasonable inference, and thus a plausible claim, that [it is entitled to relief]." *Id.* Cobb has alleged specific facts plausibly supporting an inference of a course of conduct of circuit dealing by AMC. It has therefore "raise[d] a reasonable expectation that discovery will reveal [further] evidence" and adequately states a claim for relief. *Twombly*, 550 U.S. at 556.

## IV. AMC's Clearance Exclusivity Agreements Violate the Sherman Act

Cobb also adequately alleges that AMC's exclusive clearance agreements with several of the major distributors violate Sherman Act Section 1. "To state a claim under Section 1 . . . , a plaintiff must plead sufficient facts to plausibly show that Defendants (1) engaged in concerted action that (2) unreasonably restrained

competition." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1356 (N.D. Ga. 2012). AMC does not contest that Cobb has adequately alleged the formation of clearance agreements. *See* Mot. at 7-8. Its only basis for asserting that Cobb does not plead concerted action is that Cobb allegedly does not *identify* AMC's counterparts to those agreements. *See id.* This is nonsense. "Under notice pleading," the plaintiff need only plead sufficient facts to "give the defendant fair notice" of its "co-conspirators['] . . . identi[ty]." *Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Cobb's Complaint satisfies this standard. Cobb alleges that "several of the major film distributors" have agreed to enforce AMC's blanket clearance demands. Compl. ¶ 60. There are fewer than ten "major film distributors," and AMC knows who they are. AMC also knows which ones are giving it preferential treatment—Cobb specifically identifies one of them in the Complaint (Sony, which licensed only *two* 2013 releases to Cobb's Brookhaven CinéBistro between January 1 and October 27, 2013, as compared with the *twelve* it licensed to AMC). Compl. ¶ 61. The Complaint sufficiently puts AMC on notice of its co-conspirators. Nothing more is required.[6]

AMC recycles the same arguments it made with respect to Cobb's Section 2

---

[6] *Lombard's* is entirely distinguishable. There, the plaintiff failed to plead any facts to establish a conspiracy, and "identif[ied] only 'PRINCE dealers and others at this time unknown to LOMBARD'S' as Prince's co-conspirators." 753 F.2d at 975.

claims in arguing that the Section 1 claim inadequately pleads harm to competition. For all the reasons discussed *supra*, AMC's arguments fail. And, contrary to AMC's empty assertion (Motion at 16 n.9), Cobb pleads "substantial foreclosure in a[] properly pleaded market." Virtually *all* competition between Cobb's Brookhaven CinéBistro and AMC's Buckhead theaters has been foreclosed, as AMC refuses to play a single film that is licensed to Cobb, and several distributors systematically license AMC higher-grossing films than Cobb. *See* Compl. ¶¶ 58-59, 61, 67-68, 71, 75, 126. Cobb simply cannot compete with AMC for the patronage of the Buckhead-Brookhaven residents wishing to view those films— and no other exhibitor competes in the same market.

## V.   Cobb Adequately Pleads Antitrust Injury

To have standing to bring an antitrust claim, plaintiffs must "plead . . . that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1450 (11th Cir. 1991). The Complaint meets this standard. Cobb alleges that AMC has engaged in exclusionary conduct by blocking Cobb's fair, competitive access to film, patrons, and theater space:

> This prevents [Cobb] from competing . . . in the market . . . . As a result, there is less competition for the [relevant] products, which means [a significant deterioration in quality] and fewer choices for

> consumers. This is precisely the type of harm that we
> allow plaintiffs to vindicate through the antitrust laws.

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303

(11th Cir. 2010).

## VI.   Cobb States Viable State-Law Claims

Cobb alleges that AMC's clearance agreements constitute contracts in

restraint of trade in violation of O.C.G.A. § 13-8-2 and Ga. Const. Art. 3, § 6, ¶ V.

AMC advances no new arguments for dismissing these claims. *See* Mot. at 23-25.

AMC merely repeats its unavailing contentions that "Cobb fails to plead any facts

that would make any requested clearance(s) unlawful"; "Cobb does not identify a

single patron, landlord or distributor that was allegedly induced not to do business

with Cobb"; and "Cobb has failed to adequately plead that the alleged agreements

here are unreasonable" (Mot. at 24-25). To the contrary, and as discussed at length

*supra*, Cobb alleges specific facts supporting its claim that AMC's clearance

threats, demands, and agreements—with or directed at specifically identified

distributors and landlords—have harmed, and have the potential to harm,

competition, and are thus unreasonable and illegal.

## CONCLUSION

Therefore, for the foregoing reasons, Cobb respectfully requests that the

Court deny AMC's motion to dismiss the Complaint.

Dated:  May 9, 2014                    **Fellows LaBriola LLP**


                                       /s/ Henry D. Fellows, Jr.
                                       Henry D. Fellows, Jr.
                                       Georgia Bar No. 257825
                                       Megan C. Haley
                                       Georgia Bar No. 113406
                                       225 Peachtree Street, N.E., Suite 2300
                                       Atlanta, GA 30303
                                       Telephone:  404-586-9200
                                       Facsimile:  404-586-9201
                                       E-mail:  hfellows@fellab.com
                                       E-mail:  mhaley@fellab.com

                                       *-and-*

                                       **PERKINS COIE LLP**
                                       Thomas L. Boeder (*Pro Hac Vice*)
                                       tboeder@perkinscoie.com
                                       Catherine S. Simonsen (*Pro Hac Vice*)
                                       csimonsen@perkinscoie.com
                                       1201 Third Avenue, Suite 4900
                                       Seattle, WA 98101-3099
                                       Telephone:  206-359-8000
                                       Facsimile:  206-359-9000

                                       *Attorneys for Plaintiffs*

# EXHIBIT A

AMC Phipps Plaza 14

   Sign in

**Showtimes for Atlanta, GA**

Change Location

Change

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Afternoon
Evening
Late

Theaters
Movies

› **Show list view**
Show map view

**AMC Phipps Plaza 14**
3500 Peachtree Road NE, Atlanta, GA - (888) 262-4386

Rio 2
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
1:00  1:50  3:50  6:30  7:30  9:10pm

A Haunted House 2
1hr 27min - Rated R - Comedy/Horror - Trailer - IMDb
8:00pm

Heaven Is for Real
1hr 40min - Rated PG - Drama - Trailer - IMDb
12:40  3:10  5:40  8:15pm

Oculus
1hr 45min - Rated R - Drama - Trailer - IMDb
1:50  4:30  7:20  9:55pm

Bears
1hr 18min - Rated G - Documentary - Trailer - IMDb
7:00pm

Divergent
2hr 20min - Rated PG-13 - Action/Adventure - Trailer - IMDb
12:30  3:40  6:50  10:00pm

Rio 2 in 3D
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
2:50  4:40  5:40  8:25pm

God's Not Dead
1hr 53min - Rated PG - Drama - Trailer - IMDb
2:25  5:10  7:55pm

Muppets Most Wanted
1hr 52min - Rated PG - Family/Comedy - Trailer - IMDb
1:15  4:05pm

Mr. Peabody & Sherman
1hr 30min - Rated PG - Animation/Action/Adventure/Comedy -
Trailer - IMDb
2:20  7:00pm

The Raid 2
2hr 28min - Rated R - Action/Adventure/Suspense/Thriller/Drama -
IMDb
2:30  6:00  9:20pm

The Lego Movie
1hr 40min - Rated PG - Animation/Action/Adventure - Trailer -
IMDb
3:10  5:45  8:20pm

Bad Words
1hr 29min - Rated R - Comedy - Trailer - IMDb
12:30  2:50  5:15pm

Need for Speed
2hr 10min - Rated PG-13 - Action/Adventure - Trailer - IMDb
9:55pm

Joe
1hr 57min - Rated R - Drama - Trailer - IMDb
1:20  4:05  6:55  9:50pm

Frankie and Alice
1hr 42min - Rated R - Drama - Trailer - IMDb
2:10  4:50  9:15pm

Mr. Peabody & Sherman 3D
1hr 30min - Rated PG - Animation/Action/Adventure/Comedy -
Trailer - IMDb
4:40pm

Rob the Mob
1hr 44min - Rated R - Suspense/Thriller - Trailer - IMDb
9:45pm

AMC Phipps Plaza 14    Search Movies    Search the Web

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

AMC Fork &amp; Screen Buckhead     **Sign in**

**Showtimes for Atlanta, GA**

**Change Location**

Change

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Morning
Afternoon
Evening
Late

Theaters
Movies

› **Show list view**
Show map view

**AMC Fork & Screen Buckhead**

3340 Peachtree Rd. NE, Atlanta, GA - (888) 262-4386

**Rio 2**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
11:45am  4:00  10:00pm

**A Haunted House 2**
1hr 27min - Rated R - Comedy/Horror - Trailer - IMDb
8:00  9:30pm

**Oculus**
1hr 45min - Rated R - Drama - Trailer - IMDb
1:30  4:30  7:30  10:15pm

**Divergent**
2hr 20min - Rated PG-13 - Action/Adventure - Trailer - IMDb
11:30am  2:45  6:00  9:15pm

**Rio 2 in 3D**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
1:00  7:00pm

**Muppets Most Wanted**
1hr 52min - Rated PG - Family/Comedy - Trailer - IMDb
12:30  3:30  6:30pm

**Tyler Perry's The Single Moms' Club**
1hr 51min - Rated PG-13 - Drama - Trailer
2:00  5:00  10:30pm

**About Last Night**
1hr 40min - Rated R - Comedy/Romance - Trailer - IMDb
2:30  5:30  8:30pm

AMC Fork & Screen Buckhead    Search Movies    Search the Web

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

UA Tara - Atlanta          **Sign in**

**Showtimes for Atlanta, GA**

**Change Location**

Change

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Afternoon
Evening

Theaters
Movies

› **Show list view**
Show map view

## UA Tara - Atlanta
2345 Cheshire Bridge Road NE, Atlanta, GA - (404) 634-6288

**The Grand Budapest Hotel**
1hr 40min - Rated R - Comedy/Drama - Trailer - IMDb
2:00  2:45  4:30  5:15  7:00  7:45pm

**Le Week-end**
1hr 33min - Rated R - Drama - Trailer - IMDb
2:30pm

**Jodorowsky's Dune**
1hr 30min - Rated PG-13 - Documentary/Scifi/Fantasy - IMDb
2:15  4:45  7:15pm

UA Tara - Atlanta      Search Movies   Search the Web

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

Regal Atlantic Station Stadium 18          Sign in

Showtimes for Atlanta, GA

**Change Location**

Change

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Morning
Afternoon
Evening
Late

Theaters
Movies

› **Show list view**
Show map view

## Regal Atlantic Station Stadium 18

261 19th Street NW, Atlanta, GA - (404) 347-9889

**Rio 2**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
12:00  2:05  2:35  7:15pm

**Captain America: The Winter Soldier**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
1:50  3:45  5:05  8:20  10:15pm

**Transcendence**
2hr 0min - Rated PG-13 - Scifi/Fantasy/Suspense/Thriller - Trailer - IMDb
8:45  9:30  10:15pm

**A Haunted House 2**
1hr 27min - Rated R - Comedy/Horror - Trailer - IMDb
8:00  10:25pm

**Heaven Is for Real**
1hr 40min - Rated PG - Drama - Trailer - IMDb
11:45am  2:20  4:45  7:30  9:55pm

**Oculus**
1hr 45min - Rated R - Drama - Trailer - IMDb
11:30am  2:10  4:50  7:30  10:15pm

**Draft Day**
1hr 50min - Rated PG-13 - Drama - Trailer - IMDb
12:30  1:10  4:00  4:15  6:50  7:30  9:40  10:30pm

**Bears**
1hr 18min - Rated G - Documentary - Trailer - IMDb
7:00  9:15pm

**Divergent**
2hr 20min - Rated PG-13 - Action/Adventure - Trailer - IMDb
12:40  4:00  7:20  10:40pm

**Noah**
2hr 18min - Rated PG-13 - Drama - Trailer - IMDb
12:20  1:20  3:30  4:30  7:40  10:50pm

**Rio 2 in 3D**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
11:30am  12:30  3:10  4:40  5:50  9:50pm

**Captain America: The Winter Soldier 3D**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
11:30am  12:00  12:30  1:00  2:30  3:00  3:15  5:45  6:15  7:00  9:00  10:45pm

**Muppets Most Wanted**
1hr 52min - Rated PG - Family/Comedy - Trailer - IMDb
1:30pm

**Transcendence: The IMAX Experience**
2hr 0min - Rated PG-13 - Scifi/Fantasy/Suspense/Thriller - Trailer - IMDb
8:00  11:00pm

**The Raid 2**
2hr 28min - Rated R - Action/Adventure/Suspense/Thriller/Drama - IMDb
12:10  3:30  6:50  10:20pm

**Captain America: The Winter Soldier An IMAX 3D Experience**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
1:15  4:30pm

Regal Atlantic Station Stadium 18    Search Movies    Search the Web

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

Regal Hollywood Stadium 24 @ North I-85          Sign in

**Showtimes for Atlanta, GA**

**Change Location**

[ Change ]

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Afternoon
Evening
Late

Theaters
Movies

› **Show list view**
Show map view

### Regal Hollywood Stadium 24 @ North I-85

3265 Northeast Expressway Access Rd, Chamblee, GA - (770) 936-5737

**Rio 2**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
2:20  2:50  4:55  7:30  8:00  10:05pm

**Captain America: The Winter Soldier**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
1:20  3:25  4:25  6:30  7:30  9:35  10:35pm

**Transcendence**
2hr 0min - Rated PG-13 - Scifi/Fantasy/Suspense/Thriller - Trailer - IMDb
8:00  9:30pm

**A Haunted House 2**
1hr 27min - Rated R - Comedy/Horror - Trailer - IMDb
8:00  10:15pm

**Heaven Is for Real**
1hr 40min - Rated PG - Drama - Trailer - IMDb
2:10  4:35  7:00  9:25pm

**Oculus**
1hr 45min - Rated R - Drama - Trailer - IMDb
2:35  5:10  7:45  10:20pm

**Draft Day**
1hr 50min - Rated PG-13 - Drama - Trailer - IMDb
1:40  4:20  7:00  7:45  9:40  10:25pm

**Bears**
1hr 18min - Rated G - Documentary - Trailer - IMDb
7:00  9:05pm

**Divergent**
2hr 20min - Rated PG-13 - Action/Adventure - Trailer - IMDb
3:50  7:00  10:10pm

**Noah**
2hr 18min - Rated PG-13 - Drama - Trailer - IMDb
4:15  7:15  10:15pm

**Rio 2 in 3D**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
1:50  4:25  5:25  7:00  9:35  10:35pm

**God's Not Dead**
1hr 53min - Rated PG - Drama - Trailer - IMDb
2:25  5:05  7:45  10:25pm

**Captain America: The Winter Soldier 3D**
1:50  3:55  4:55  7:00  8:00  10:05pm
1hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb

**The Grand Budapest Hotel**
1hr 40min - Rated R - Comedy/Drama - Trailer - IMDb
2:15  4:45  7:15  9:45pm

**Muppets Most Wanted**
1hr 52min - Rated PG - Family/Comedy - Trailer - IMDb
2:40  5:20  8:00  10:40pm

**Mr. Peabody & Sherman**
1hr 30min - Rated PG - Animation/Action/Adventure/Comedy - Trailer - IMDb
1:55  4:30  7:00  9:30pm

**The Raid 2**
2hr 28min - Rated R - Action/Adventure/Suspense/Thriller/Drama - IMDb
3:55  7:10  10:25pm

**Non-Stop**
1hr 50min - Rated PG-13 - Action/Adventure/Suspense/Thriller - Trailer - IMDb
1:50  4:25pm

**Son of God**
2hr 18min - Rated PG-13 - Drama - Trailer - IMDb
3:55pm

**Frozen**
1hr 48min - Rated PG - Animation/Action/Adventure/Comedy - Trailer - IMDb
2:35  5:10pm

**The Lego Movie**
1hr 40min - Rated PG - Animation/Action/Adventure - Trailer - IMDb
2:20  4:50  7:20  9:50pm

**300: Rise of an Empire**
1hr 42min - Rated R - Action/Adventure/Drama - Trailer - IMDb
2:15  4:45pm

**Cesar Chavez**
1hr 41min - Rated PG-13 - Drama - Trailer - IMDb
2:15pm

**Frankie and Alice**
1hr 42min - Rated R - Drama - Trailer - IMDb
2:10  4:40  7:10  9:40pm

Regal Hollywood Stadium 24 @ N  [ Search Movies ]  [ Search the Web ]

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

UA Perimeter Pointe 10

   Sign in

Showtimes for Atlanta, GA

**Change Location**

Change

› **Today**
Tomorrow
Saturday
Sunday

› **All times**
Afternoon
Evening
Late

Theaters
Movies

› **Show list view**
Show map view

### UA Perimeter Pointe 10

1155 Mount Vernon Highway, Atlanta, GA - (770) 481-0255

**Rio 2**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
12:00  1:45  7:15pm

**Captain America: The Winter Soldier**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
12:45  4:00  5:15  9:15  10:30pm

**Transcendence**
2hr 0min - Rated PG-13 - Scifi/Fantasy/Suspense/Thriller - Trailer - IMDb
8:00  9:15  10:45pm

**A Haunted House 2**
1hr 27min - Rated R - Comedy/Horror - Trailer - IMDb
8:00  9:30  10:30pm

**Heaven Is for Real**
1hr 40min - Rated PG - Drama - Trailer - IMDb
12:30  2:55  5:30  8:00  10:30pm

**Oculus**
1hr 45min - Rated R - Drama - Trailer - IMDb
12:00  2:45  5:25  8:10  10:45pm

**Draft Day**
1hr 50min - Rated PG-13 - Drama - Trailer - IMDb
12:30  3:45  5:15  6:35  8:00  10:45pm

**Divergent**
2hr 20min - Rated PG-13 - Action/Adventure - Trailer - IMDb
3:05  6:15pm

**Noah**
2hr 18min - Rated PG-13 - Drama - Trailer - IMDb
12:30  3:40pm

**Rio 2 in 3D**
1hr 41min - Rated G - Animation/Comedy - Trailer - IMDb
4:30  9:50pm

**Captain America: The Winter Soldier 3D**
2hr 15min - Rated PG-13 - Action/Adventure - Trailer - IMDb
2:00  7:25pm

**Muppets Most Wanted**
1hr 52min - Rated PG - Family/Comedy - Trailer - IMDb
2:30pm

**Mr. Peabody & Sherman**
1hr 30min - Rated PG - Animation/Action/Adventure/Comedy - Trailer - IMDb
12:30  2:55  5:30pm

UA Perimeter Pointe 10   Search Movies   Search the Web

Language Tools | Search Tips

Google Home - Advertising Programs - Business Solutions - About Google

©2013 Google

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

/s/ Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
**FELLOWS LABRIOLA LLP**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
**FELLOWS LaBRIOLA LLP**