# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC, | § § § |
| Plaintiffs, | § § |
| v. | § § CIVIL ACTION |
| AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC., | § NO. 1:14-CV-00182-SCJ § § § § § |
| Defendants. | § § |

## AMC'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION TO DISMISS

Mary C. Gill
Adam J. Biegel
Jonathan D. Parente
ALSTON & BIRD LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA  30309-3424
Telephone:     (404) 881-7000
Facsimile:     (404) 881-7777

Michael A. Swartzendruber
Jason K. Fagelman
Rachel L. Williams
Nicholas Taunton
(*Admitted pro hac vice*)
FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue, Suite 2800
Dallas, TX  75201-2784
Telephone:     (214) 855-8000
Facsimile:     (214) 855-8200

Darryl Anderson
*(Pro hac vice application pending)*
FULBRIGHT & JAWORSKI LLP
1301 McKinney Street, Suite 5100
Houston, TX  77010
Telephone:     (713) 651-5562
Facsimile:     (713) 651-5246

## SUMMARY OF ARGUMENT

Cobb cannot allege that AMC has monopolized, or strangled competition for, movies in and around Atlanta. Instead, Cobb's fundamental claim is that film licenses between AMC and distributors harmed Cobb's CinéBistro—a single competing theater. To sidestep the obvious market and competitive injury hurdles, Cobb argues that the Court may recognize the "Buckhead-Brookhaven Zone"— formulated simply by drawing a line around Plaintiffs' and Defendants' theaters— as an independent geographic market unto itself. Once numerous other theaters are thus excluded by tautology, monopolization has ostensibly occurred, and alleged harm to CinéBistro purportedly suffices as harm to competition in the "market."

Fortunately, antitrust law does not allow this. If it did, any retailer in the country could cast its nearest competitor as a monopolist, even in the midst of a city rife with competition. No doubt, a good number of Atlanta residents may be "reluctant" to travel to buy gas anywhere beyond the closest gas station; yet the neighborhood Shell station is not a monopolist. Under Cobb's theory, Atlanta is not a city with a thriving movie theater market, it is a conglomeration of miniature, monopolized markets—where presumably United Artists has monopolized Druid Hills, Regal has monopolized Dunwoody, and LeFont has monopolized Sandy Springs.

1

Such claims would fail, however, just as Cobb's must. Antitrust claims predicated on a "market" untethered from basic antitrust principles—which require inclusion of all competitors whose substitutable goods could plausibly reach consumers if the defendant raised its prices or lowered its output—are regularly dismissed. *See Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327, 1336 (11th Cir. 2010); *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998); *Queen City Pizza v. Domino's Pizza,* 124 F.3d 430 (3d Cir. 1997); *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247, 1261 (N.D. Ga. 2012); *JES Props. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1281-82 (M.D. Fla. 2003). "Where there is no Market, there is no Monopoly." *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991).

Further, Cobb fails to allege facts supporting its purported "circuit dealing" claim under Section 1 or 2 of the Sherman Act, including: (i) ***any*** market supposedly leveraged, (ii) a lack of "substantial competition" that justifies the clearance as reasonable, (iii) the identity of alleged co-conspirators, or (iv) facts, such as increased price or decreased output, showing injury to competition. Where a plaintiff, like Cobb, fails to plead ***facts*** supporting each of the elements of an antitrust claim, the deficiency is all the more egregious. *See, e.g., Aquatherm*

2

*Indus.,* 971 F. Supp. at 1424 ("When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery").

**ARGUMENT AND AUTHORITIES**

**I.     Cobb's Monopolization Claim (Sherman Act Section 2) Fails**

**A.     Cobb Has Failed to Plead a Cognizable Antitrust Market**

**1.     The Geographic Market Allegation Is Woefully Deficient**

Cobb concedes that to survive dismissal, it must allege facts to support the "contours of the relevant geographic and product markets." (Dkt. No. 25 at 9 (citing *Jacobs,* 626 F.3d at 1336)).[1] As Cobb's own cited case explains, "[a] geographic market is only relevant for monopoly purposes where . . . consumers within the geographic area ***cannot realistically turn to outside sellers*** should prices rise within the defined area." *T. Harris Young & Assocs.,* 931 F.2d at 823 (emphasis added); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 423 (11th Cir. 1984) ("in order to find a market relevant, purchasers

---

[1] Cobb also argues that the relevant market is a fact question, relying on *T. Harris Young & Assoc.,* 931 F.2d at 823. (Dkt. No. 25 at 9.) Even still, an antitrust plaintiff must allege ***those facts*** that, if proven, would plausibly show a relevant market. *See, e.g., Atlanta Fiberglass USA, LLC*, 911 F. Supp. 2d at 1261 (dismissing antitrust claims because plaintiff "failed to allege a relevant geographic market in which harm to competition is alleged to occur"); *T. Harris Young & Assoc.,* 931 F.2d at 823 (finding the evidence insufficient to present a jury question regarding market).

must, as a practical matter, be *unable* to turn to suppliers outside their own area") (emphasis added) (citation omitted).

It is striking, therefore, that the Buckhead-Brookhaven "market" rests on a single allegation: Moviegoers in and around Buckhead and Brookhaven are "reluctant" to travel significant distances outside of the zone due to "heavy traffic." (Compl., Dkt. No. 1 ¶ 39.) One need not dispute this vague sentiment, or Atlanta traffic, to recognize it has absolutely no antitrust significance. An antitrust market is not defined by where consumers most prefer to purchase the product at issue—there is always a most convenient retailer—but rather by where they can "practicably turn for supplies." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1247 (11th Cir. 2002); *see also JES Props.*, 253 F. Supp. 2d at 1282 ("geographic market . . . includes the geographic area in which consumers can practically seek alternative sources of the product"). The antitrust question is whether, if AMC raised prices, neighborhood filmgoers would be constrained to pay the price, or whether they would overcome any erstwhile "reluctance" to drive to the next theater down the road.[2] *See Bailey*, 284 F.3d at 1249. The answer is obvious, and the Complaint's conspicuous failure to address this fundamental issue requires dismissal.

---

[2] Notably, the Complaint fails to disclaim that at least some consumers in areas "in or around Buckhead or Brookhaven" are actually closer to nearby theaters. (Compl., Dkt. No. 1 ¶ 39; *cf.* Motion to Dismiss, Ex. A, Dkt. No. 19-2.)

4

It is not plausible that AMC could raise prices without consumer loss—movie-goers could visit any of the many theaters in town. (Motion to Dismiss, Ex. A, Dkt. No. 19-2.)[3]  Therefore, those theaters must be included in a properly-pleaded relevant market—or Cobb must allege *facts* justifying their exclusion. *See Atlanta Fiberglass USA,* 911 F. Supp. 2d at 1261 ("The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential, and not the market area of a single company.") (internal citations omitted); *see also T. Harris Young & Assoc.*, 931 F.2d at 823 ("the location and facilities of other producers and distributors must be considered in determining the relevant geographic market").  The unprecedented narrowing of the market to include only plaintiffs and defendants implicitly makes a monopolist of almost every store in town.

### 2. The Product Market Allegations Are Also Inadequate

A failure to plead a lack of cross-elasticity of demand between potential product substitutes requires dismissal.  (*See* Dkt. No. 19-1 at 22.)  Cobb's Response does not distinguish any of the cases cited by AMC.  The Complaint falls short because it failed to address obvious substitutes—such as pay-per-view,

---

[3] Although Cobb moves to strike Motion Ex. A, it only objects to "driving time" estimates therein, not the map itself.  Cobb thus does not dispute the patently obvious fact that several other theaters are located nearby in Atlanta.

internet, and DVD movie providers—with facts that plausibly suggest a lack of cross-elasticity of demand between those means of watching a film and watching it in a theater. Cobb claims that home viewing is less desirable than theater attendance, films are generally released on DVD only after their "first run" in theaters, and renting a film on DVD is cheaper. (Compl., Dkt. No. 1 ¶¶ 18, 19, 23; Dkt. No. 25 at 12-13.) But these allegations at best suggest that home viewing and theater viewing are not identical products; they do not suggest that a price hike would not cause moviegoers to substitute cheaper in-home viewing.[4] *See, e.g., Bailey*, 284 F.3d at 1246 ("A relevant product market does not consist solely of the specific product over which parties engage in a price war. Rather, in determining a seller's monopoly power, it is necessary to examine both the product at issue and all reasonable substitutes available to consumers.").[5]

### B. AMC Lacks Monopoly Power

Because the Buckhead-Brookhaven zone is not a relevant antitrust market, it cannot serve as the basis for determining market share or monopoly power. *See T.*

---

[4] In fact, these alternative options at relatively lower pricing plausibly show that consumers would make exactly such a substitution given the chance.

[5] The Response also attempts to narrow the product market further than the Complaint, urging that a nearby theater is an "art-house theater that does not offer the product at issue." (Dkt. No. 25 at 11 n.2.) But the alleged product market(s) are "for licensing films" and the "exhibition of films to patrons" (Compl., Dkt. No. 1 ¶¶ 41, 49); and there are no allegations about other theaters at all, much less the contention that an "art house" does not license and exhibit films to patrons.

*Harris Young & Assoc.,* 931 F.2d at 823; *JES Props.*, 253 F. Supp. 2d at 1284. Therefore, Cobb's allegation regarding the seats in AMC theaters in the Buckhead-Brookhaven zone is irrelevant. (*See* Dkt. No. 25 at 13.)[6] There is no allegation that AMC has monopoly power over the Atlanta area film market, or any valid market.

Still, Cobb's argument fails even in the untenable Buckhead-Brookhaven zone. Cobb cites *Bailey,* arguing that the Court can "presume the existence of AMC's monopoly power" when barriers to entry are high. 284 F.3d at 1250; Dkt. No. 25 at 13; Compl., Dkt. No. 1 ¶ 95 (referencing a general statement about metropolitan areas, not about Atlanta, much less Buckhead-Brookhaven). But the *Bailey* court found the plaintiff could ***not*** establish market power where its allegation of market share was less than 70 percent. 284 F.3d at 1250 (explaining the threshold as "70 or 75 percent for the five years preceding the complaint") (quoting IIIA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 801a (2d ed. 2002)). Cobb's allegations are similarly defective. Furthermore, the allegations actually suggest that any barriers to entry are low. Cobb admits it entered the market in 2011 and quickly gained one third of the purported "market share," from what would then, by Cobb's seat-count definition, have ben AMC's

---

[6] Additionally, percentage of seats is not a competent measure of monopoly power or market share; it reflects potential ***capacity***, not sales in the marketplace.

"100% market share" in Buckhead-Brookhaven.  (Compl., Dkt. No. 1 ¶ 54, 51.) Cobb's allegations do not constitute monopoly power under *Bailey*.

### C. Cobb Fails to Allege Harm to Competition

Cobb agrees that, in addition to a relevant market, it must also allege harm ***to competition*** in that market.  (Dkt. No. 25 at 16.)  As Cobb concedes, "[a]ctual anticompetitive effects include . . . reduction of output, increase in price, or deterioration in quality."  *Jacobs,* 626 F.3d at 1339 (affirming dismissal where the complaint "failed to adequately allege actual or potential harm to competition.").[7] There is no dispute that Cobb does not allege reduced output or increased prices.  (Dkt. No. 25 at 16-17.)

Instead, Cobb alleges that movie-goers prefer the "superiority" of CinéBistro, but must occasionally substitute AMC's theaters to watch a particular movie when it's not being played at CinéBistro.  *Id.*  But Cobb does not cite any case finding that such substitution constitutes cognizable deterioration of quality and harm to competition, because courts have squarely rejected this argument.  *See Spanish Broad. Sys. of Fla*., 376 F.3d at 1076 ("The use of unfair means resulting

---

[7] Cobb also argues that it alleged ***potential*** anti-competitive effects.  (Dkt. No. 25 at 18.)  But the Response fails to point out any such potential effects (*e.g.,* potential price increases) and Cobb fails to "define the relevant market" and is "bereft of the critical allegations linking [AMC's] market power to [any potential] harm to competition."  *Jacobs,* 626 F.3d at 1339, 1340.

8

in the substitution of one competitor for another without more does not violate the antitrust laws."). For this reason, courts reviewing precisely Cobb's allegation—required consumer substitution of one theater for another—have found it does not constitute harm to competition. *See Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, No. 03 Civ. 1895, 2007 WL 39301 (S.D.N.Y. Jan. 8, 2007); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 Civ. 5499, 2004 WL 691680, at *10 (S.D.N.Y Mar. 31, 2004); *see also Three Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1400 (9th Cir. 1987) ("We agree with the district court's conclusion that TMT failed to demonstrate injury to competition by the Galleria's clearances over TMT's theater."). And courts ruling in non-film antitrust cases reach the same result. *See Keller v. Greater Augusta Ass'n of Realtors,* 760 F. Supp. 2d 1373, 1378 (S.D. Ga. 2011) (dismissing complaint for failure to allege harm to competition despite allegation of harm to "public choice"); *Mfg. Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir. 1982) (affirming directed verdict in favor of defendant and finding no anticompetitive effects). Cobb cannot distinguish these cases or support its assertion that they were wrongly decided. (*See* Dkt. No. 25 at 17-18.)

Cobb's analysis lacks any case authority because it improperly disjoins the alleged product at issue from the theory of competitive harm. Cobb has not alleged

a deterioration in the quality of "first run, feature-length motion pictures," which Cobb identifies as the relevant product. (*See* Dkt. No. 25 at 12.) Instead, Cobb alleges a reduction in the quality of *movie theaters*—based solely on the false assertion that AMC theaters are inferior to CinéBistro. *Id.* at 17. Moviegoers are not buying movie theaters; they are buying tickets to see films. The competitive impact must be felt in the relevant product market at issue. *See, e.g., Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 728 (3rd Cir. 1991) (finding no harm to competition where Ford distributor argued it provided better service and credit terms than other dealers, but quality of cars was not impacted).[8]

### D.   The Complaint Does Not Allege Predatory Conduct

Clearances and other vertical restraints are routinely upheld by the courts as reasonable and procompetitive, and there is nothing about the clearances alleged in this case that distinguishes them. (Dkt. No. 19-1 at 18-19.) Utterly ignoring the cases cited by AMC, Cobb asks this Court to conclude that clearances "serve no procompetitive purpose" and are employed only for purposes of monopolization. (Dkt. No. 25 at 22.) Cobb cites *no case* supporting this drastic rewriting of law.

First, Cobb fails to respond at all to AMC's argument that, under recent precedent specifically relating to clearance agreements, the alleged clearances are

---

[8] Cobb's reference to "deterioration in quality" in *Jacobs* cites to *U.S. v. Brown Univ.*, 5 F.3d 658, 668 (3rd Cir. 1993), which in turn cites to *Tunis Bros.*

reasonable restraints because they are imposed between theaters "in substantial competition." (Dkt. No. 19-1 at 19.) This is undoubtedly because the Complaint concedes the theaters are competitors. (Compl., Dkt. No. 1 ¶ 49, Dkt. No. 25 at 11 n.2.)

Moreover, Cobb's argument reflects a fundamental misunderstanding of the sharp distinction the Supreme Court has drawn (without regard to specific industries) between restraints affecting "interbrand competition"—competition between manufacturers, such as GM and Ford, or Sony and Disney—and restraints affecting "intrabrand competition"—competition between distributors, such as car dealerships or movie theaters. Courts have repeatedly (and recently) explained that restrictions on intrabrand competition are frequently procompetitive, and thus lawful, because they enhance interbrand competition. *See, e.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877, 890 (2007) (explaining a distributor's agreement not to sell products below an agreed price "can stimulate interbrand competition . . . by reducing intrabrand competition"); *Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36, 54-55 (1977); s*ee also L.A. Draper & Son,* 735 F.2d at 420 ("Other restraints on trade, such as territorial restrictions that a manufacturer imposes on a distributor, have possible procompetitive influences on a given market"). Indeed, the Eleventh Circuit has recognized that even eliminating

11

intrabrand competition entirely (not present here) can be procompetitive. *Jacobs*, 626 F.3d at 1335-36 (recognizing that eliminating intrabrand competition can incentivize dealers to "more effectively sell the manufacturers' products"). The Complaint contains no allegations rebutting the recognized, pro-competitive benefits of such intrabrand restraints through clearances, including incentives to invest in enhanced services and increased interbrand competition.[9] (*See* Dkt. No. 25 at 22; cf. Compl., Dkt. No. 1 ¶¶ 26, 30 (alleging only that substantial extra film advertising by theaters is rare, not denying interbrand competition)).

Thus, the accusation that AMC's argument is inconsistent with *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), is deeply misleading. (*See* Dkt. No. 25 at 20.) That case did not involve intrabrand restrictions at all, and it does not contradict *Leegin*'s recognition that intrabrand restrictions, even on price, are often procompetitive and perfectly lawful.

## II.  Cobb's Conspiracy Claim (Sherman Act Section 1) Fails

Cobb makes no other arguments regarding its Section 1 claim, except to maintain that its allegations are sufficient for AMC to somehow identify co-

---

[9] Clearances also decrease dispersion, concentrating filmgoers in a single audience. This increases the time a film plays in theaters, allows film distributors to reach large audiences with fewer showings, increases the variety of films offered to the public, and promotes interbrand competition. *See Three Movies of Tarzana,* 828 F.2d at 1399. These are paradigmatic examples of the "redeeming virtues" of intrabrand restrictions. *See Cont'l T.V.,* 433 U.S. at 54-55.

conspirators.[10]  Cobb cannot meaningfully distinguish *Lombard's Inc. v. Prince Manufacturing., Inc.* or support its own argument to the contrary.  753 F.2d 974 (11th Cir. 1985).  As detailed in the Motion, the Section 1 claim must be dismissed because it fails to allege (i) an agreement, (ii) anti-competitive effects in a relevant market, and (iii) a lack of procompetitive justification.  *Levine,* 72 F.3d at 1551.

### III. Circuit Dealing Allegations Do Not Establish Violations of Section 1 or 2

Cobb also argues that the clearances at issue are unlawful because they are the product of "circuit dealing."  (Dkt. No. 25 at 23-24.)  Cobb's circuit dealing allegations fail under either Section 1 or Section 2.  First, Cobb not only concedes that it has not stated a claim for monopoly leveraging (*i.e.*, use of alleged monopoly power in other unidentified markets to produce anticompetitive effects in the alleged Buckhead-Brookhaven market), it adamantly denies such an assertion.  (Dkt. No. 25 at 16.)[11]  Cobb's later arguments referencing AMC's "closed towns" or "monopoly towns" (*id.* at 23, 26) are misleading because Cobb admittedly has not identified any other towns where AMC has monopoly power to

---

[10] In reality, Cobb cannot even do that, instead asserting that there are "fewer than ten" and that "AMC knows who they are"—the equivalent to suggesting that "you know what you did" suffices to allege a claim.  (Dkt. No. 25 at 28.)  Of course, both assertions fail under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[11] In monopoly leveraging, a monopolist "uses its monopoly power in one market to gain a competitive advantage in another," just as is described in *United States v. Griffith*, 334 U.S. 100 (1948).  *Aquatherm Indus., Inc.*, 145 F.3d at 1262.

leverage—though Cobb concedes this would be required to state such a claim. (Dkt. No. 25 at 16.) Thus, Cobb's circuit dealing allegations are, at best, a straightforward Section 2 claim. For the reasons discussed *supra*, however, a monopolization claim must be dismissed. To the extent Cobb seeks to plead a Section 1 violation here, this is simply a restatement of Cobb's Section 1 clearance claim—that AMC and distributors agreed to unreasonable clearance agreements. Whether prompted by AMC's leveraging of monopoly power elsewhere or not (and Cobb concedes it has not pleaded such leverage)—any Section 1 claim fails under traditional clearance and rule of reason analysis.[12]

## IV. Cobb Has Not Alleged an Antitrust Injury

Finally, separately justifying dismissal, the Complaint fails because Cobb does not allege an antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 490 (1977); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1455 (11th Cir. 1991). Cobb merely cites to *Palmyra Park Hospital, Inc. v.*

---

[12] Cobb also argues circuit dealing is illegal per se. (Dkt. No. 25 at 8.) However, vertical restraints, like the alleged clearances between AMC and distributors, are subject to the rule of reason. *Jacobs,* 626 F.3d at 1335 ("The Court also declared non-price vertical restraints inappropriate for per se condemnation, applying instead the rule of reason.") (citing *Cont'l T.V.*, 433 U.S. at 57-58). In 2007, the Supreme Court expanded the reach of rule of reason analysis further, to cover vertical price restraints as well. *Leegin*, 551 U.S. at 898 (overturning *Dr. Miles*). "By contrast, per se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices . . . horizontal price fixing among competitors, group boycotts, and horizontal market division." *Jacobs,* 626 F.3d at 1335.

*Phoebe Putney Memorial Hospital*, 604 F.3d 1291, 1299 (11th Cir. 2010), but that case is inapposite. *Palmyra* did not involve intrabrand competition, as this case does, and the violations in *Palmyra* allegedly decreased output and increased prices in a relevant market.[13] Cobb's injury is like that alleged in *Todorov*, where a doctor complained of his exclusion from a radiology group. 921 F.2d at 1452-54. The injury suffered by a middleman who is denied the ability to sell a product is not antitrust injury under Eleventh Circuit precedent.[14]

## CONCLUSION

For all these reasons, dismissal is warranted.[15] Importantly, an opportunity to replead would be futile. This is not a case of undeveloped pleadings that require more specificity; it is instead a theory of liability that is foreclosed by well-established antitrust precedent as a matter of law. The Complaint should be dismissed with prejudice.

---

[13] The plaintiff in *Palmyra* pleaded a valid geographic market consisting of ten counties in southwest Georgia. *Id.* at 1296.

[14] Additionally, *Todorov* shows that where the restraint raises prices (which Cobb does not even allege), that is still not enough to establish antitrust injury in the context of intrabrand restraints. 921 F.2d at 1454.

[15] Cobb offers no argument in support of its state law claims distinct from its federal antitrust arguments. Thus, the failure of the federal claims is fatal to the state law claims as well.

Dated: June 13, 2014   Respectfully submitted,

/s/ Jonathan D. Parente
Mary C. Gill
Georgia Bar No. 294776
mary.gill@alston.com
Adam J. Biegel
Georgia Bar No. 056898
adam.biegel@alston.com
Jonathan D. Parente
Georgia Bar No. 425727
jonathan.parente@alston.com
    ALSTON & BIRD LLP
    One Atlantic Center
    1201 W. Peachtree Street
    Atlanta, GA  30309-3424
    Telephone:  (404) 881-7000
    Facsimile:  (404) 881-7777

Michael A. Swartzendruber
Texas Bar No. 19557702
michael.swartzendruber@nortonrosefulbright.com
Jason K. Fagelman
Texas Bar No. 00796525
jason.fagelman@nortonrosefulbright.com
Rachel L. Williams
Texas Bar No. 24067175
rachel.williams@nortonrosefulbright.com
Nicholas Taunton
Texas Bar No. 24079439
nicholas.taunton@nortonrosefulbright.com
(*Admitted pro hac vice*)
    FULBRIGHT & JAWORSKI LLP
    2200 Ross Avenue, Suite 2800
    Dallas, TX  75201-2784
    Telephone:  (214) 855-8000
    Facsimile:  (214) 855-8200

>Darryl Anderson
>Texas Bar No. 24008694
>darryl.anderson@nortonrosefulbright.com
>*(Pro hac vice application pending*)
>>FULBRIGHT & JAWORSKI LLP
>>1301 McKinney Street, Suite 5100
>>Houston, TX 77010
>>Telephone:     (713) 651-5562
>>Facsimile:     (713) 651-5246
>
>**COUNSEL FOR DEFENDANTS AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC.**

17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC., <br><br> Defendants. | § § § § § § § § § § § § § § § §  CIVIL ACTION NO. 1:14-CV-00182-SCJ |

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D**

I certify that this reply was prepared with 14 point Times New Roman font, in compliance with Local Rule 5.1.

Dated this 13th day of June, 2014.

/s/ Jonathan D. Parente

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC, §§§§§ Plaintiffs, §§ v. §§§ AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC., §§§§§ Defendants. | CIVIL ACTION NO. 1:14-CV-00182-SCJ |

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing reply with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated this 13th day of June, 2014.

/s/ Jonathan D. Parente