# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

COBB THEATRES III, LLC and    *
COBB THEATRES IV, LLC,    *
   *
      Plaintiffs,    *
   *
      v.    *       1:14-CV-00182-ELR
   *
AMC ENTERTAINMENT    *
HOLDINGS, INC.; AMC    *
ENTERTAINMENT, INC.; and    *
AMERICAN MULTI-CINEMA, INC.,    *
   *
      Defendants.    *

_____

# O R D E R
_____

Plaintiffs Cobb Theatres III, LLC and Cobb Theatres IV, LLC (hereinafter "Plaintiffs" or "Cobb") brought this action against AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc., (collectively "Defendants" or "AMC") for alleged violations of the Sherman Antitrust Act and various state laws. The case is presently before the Court on Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 19), Plaintiffs' Notice of Objection and Motion to Strike (Doc. No. 24), and Plaintiffs' Motion for Leave to File Response to Defendants' Second Notice of Supplemental Authority (Doc. No. 42). For the reasons that follow, the Court grants Plaintiffs' Motion for Leave to File

Response, denies Plaintiffs' Motion to Strike, and denies Defendants' Motion to Dismiss.

## I.   BACKGROUND

### A. *Factual Background*

As it must, the Court accepts as true the factual allegations set forth in the Complaint and draws all reasonable inferences in the light most favorable to Plaintiffs.

Cobb operates seven upscale movie theatres throughout the country—known as "CinéBistros"—that combine the experience of fine dining with film exhibition. (Compl. ¶ 37, Doc. No. 1.) One such venue, the CinéBistro at Town Brookhaven (the "Brookhaven CinéBistro"), is located in Brookhaven, Georgia. (Id. ¶ 6.) The Brookhaven CinéBistro features seven screens and has the capacity to seat 758 patrons. (Id. at 37.) AMC, on the other hand, is one of the largest theatre companies in the United States. (Id. ¶¶ 10, 11.) Relevant to this case, AMC operates two theatres in Buckhead, a neighborhood in Atlanta, Georgia adjacent to the City of Brookhaven. (Id. ¶¶ 35, 36.) The first theatre, the AMC Phipps Plaza 14, boasts fourteen screens and 1,046 seats. (Id. ¶ 35.) The second, a smaller venue known as the AMC Fork & Screen Buckhead, has just six screens and 650 seats. (Id. ¶ 36.) Together, the Brookhaven CinéBistro and AMC's two Buckhead theatres comprise "the Buckhead-Brookhaven zone." (Id. ¶ 39.) In the film industry, a "zone" is a geographic area identified by a distributor for purposes of

licensing films.[1] (Id. ¶ 27.) Theatres within each zone compete with one another to exhibit films to the public. (Id.)

As a general matter, the Complaint alleges considerable distinctions between the respective movie viewing experiences offered by Cobb and AMC. (Id. ¶¶ 38, 47.) On the one hand, Plaintiffs highlight the amenities offered at their theatres, including "valet parking on weekends and holidays, reserved seating, elegant and sophisticated auditoriums and lounges, high-back leather rocking chairs, in-theatre, full-service dining prior to the start of the film, a freshly prepared and seasonal American bistro menu and full bar (in addition to traditional movie theatre snacks), 100% digital cinema and theatre technology, 3-D capabilities, and no on-screen advertisements." (Id. ¶ 38.) Plaintiffs also point out that CinéBistros offer an adults-only environment after 6:00 P.M. (Id.) In contrast, the Complaint alleges Defendants deter theatre patrons "with on-screen advertising, harsh neon lighting, limited food and beverage offerings (and distracting food and beverage service throughout the entire film-play period at the AMC Fork & Screen Buckhead), accommodation of loud children and young people who can destroy the movie-going experience for others, and generally less pleasant atmosphere." (Id. at 47.)

Despite the alleged superior quality of their theatres, Plaintiffs contend several major film distributors have given Defendants preferential treatment thus depriving the Brookhaven CinéBistro of a fair opportunity to compete with AMC's

---

[1]     A "distributor" is an entity that markets, promotes, and licenses films. (Compl. ¶ 21.) Sony Pictures and Warner Brothers are examples of film distributors. (Id. ¶ 61.)

Buckhead theatres. (Id. ¶ 48.) According to Plaintiffs, Defendants have ensured such treatment by engaging in the type of anti-competitive conduct prohibited by the Sherman Antitrust Act and various Georgia laws. (Id. ¶¶ 100–53.)

The events underlying this suit began shortly after Cobb and AMC competed to lease the space where the Brookhaven CinéBistro is currently located. (Id. ¶ 54.) Unhappy after losing that battle to Plaintiffs, AMC began requesting "clearances" for its nearby Buckhead theatres. (Id. ¶¶ 54–79.) The term "clearance" refers to a practice in the film industry whereby a distributor agrees to license a particular film to only one theatre in a given geographic area rather than engaging in a "day-and-date" release, i.e. allowing multiple theatres within a region to exhibit the same film on the same day. (Id. ¶ 29.) Prior to 2009, AMC did not request clearances over its nearby competitors. (Id. ¶ 55.) However, after a significant restructuring of management, the theatre chain purportedly changed its policy and began a nationwide campaign to demand clearances over film exhibitors to "[insulate] itself from competition on the merits." (Id. ¶¶ 1, 54–79.)

More specifically, Plaintiffs contend the Senior Vice President and Head Film Buyer for AMC's Buckhead theatres sent a letter to "the major film distributors" in 2010 stating:

> [The Brookhaven CinéBistro] is 1.9 miles northeast of our AMC PHIPPS 14 and 2.5 miles northeast of our AMC FORK & SCREEN BUCKHEAD 6, and thus we will not play day-and-date with a venue at this location . . . . We have played 100% of your wide commercial releases and look forward to continuing that arrangement going forward.

4

(Id. ¶ 58.) The Complaint alleges this letter operated as a demand by AMC that distributors refuse to license certain films to the Brookhaven CinéBistro or, alternatively, risk damaging their relationships with one of the nation's largest film exhibitors. (Id. ¶ 59.) Plaintiffs further contend that, as a direct result of the letter, several major distributors began to honor AMC's demand for preferential treatment and allocated the Brookhaven CinéBistro fewer high-grossing, popular films.[2] (Id. ¶ 62.)

Plaintiffs also assert Defendants have interfered with their attempts to lease new space near existing AMC theatres. (Id. ¶ 87.) Specifically, Plaintiffs allege that AMC threatens landlords it will request clearances for its nearby theatres if the landlord decides to lease space to one of AMC's competitors, including Cobb. (Id.) Landlords are thus deterred from leasing to those competitors out of fear that the threatened clearances would make it difficult for the new theatre to license films thereby reducing customer traffic to the landlord's property. (Id.)

Despite their purported ability to offer moviegoers an overall better film viewing experience, Plaintiffs argue they have been deprived of a fair opportunity to compete with AMC's Buckhead theatres. Interestingly, Plaintiffs allege Defendants' conduct is not unique to the specific theatres at issue in this case but is

---

[2]      To support this contention, Plaintiffs cite the time period between January 1, 2013 and October 27, 2013, during which Sony Pictures licensed Elysium and Captain Phillips to the Brookhaven CinéBistro. (Compl. ¶ 61.) During those same dates, "Sony Pictures licensed to one or both of AMC's Buckhead theatres After Earth, The Amazing Spider-Man, Battle of the Year, The Call, Carrie, Evil Dead, Grown Ups 2, The Mortal Instruments, One Direction: This Is Us, This is the End, White House Down, and Zero Dark Thirty." (Id.)

instead a part of nationwide strategy to employ anticompetitive tactics to gain an unfair advantage in the marketplace.[3] As necessary, the Court will discuss additional facts in its analysis below.

## B. *Procedural Background*

On January 22, 2014, Cobb filed suit in this Court seeking relief for AMC's alleged violations of the Sherman Antitrust Act and various Georgia laws. The Complaint alleges: 1) Defendants violated sections 1 and/or 2 of the Sherman Act by engaging in "circuit dealing" (Count I); 2) Defendants violated section 2 of the Sherman Act by engaging in monopolization and/or unlawful exercise of monopoly power (Count II); 3) Defendants violated section 2 of the Sherman Act by attempting to engage in monopolization; 4) Defendants violated section 1 of the Sherman Act by engaging in "exclusive dealing" (Count IV); and 5) Defendants violated various Georgia laws (Counts V and VI). Defendants subsequently filed the present Motion to Dismiss for Failure to State a Claim (Doc. No. 19) on April 1, 2014.

In addition to filing a response, Plaintiffs filed a Notice of Objection and Motion to Strike (Doc. No. 24) Exhibit A to Defendants' Motion to Dismiss and all arguments relying thereon. The exhibit at issue is a Google map printout showing the location of various theatres in the Atlanta area. Citing the map, Defendants ask

---

[3]     Concerning a space located in Miami, Florida, Plaintiffs allege the President and CEO of AMC told the President and CEO of Cobb that AMC would use its "full weight and power" to prevent a CinéBistro from opening in that location. (Compl. ¶ 91.)

the Court to take judicial notice of the fact that "[t]he Regal Hollywood 24, Regal Perimeter Point Stadium 10, Regal Atlantic Station Stadium 16, and United Tara Cinemas 4 are all approximately 15 minutes away [from the Brookhaven CinéBistro], according to the 'Directions' feature on Google Maps." (Mem. of Law in Supp. of Defs.' Mot. to Dismiss 2–3, Doc. No. 19-1.)

On January 15, 2015, the parties appeared for oral argument regarding the motions before the Court. Three weeks later, Defendants filed a Notice of Supplemental Authority (Doc. No. 41) to which Plaintiffs seek leave to file a response (Doc. No. 42). For good cause shown, the Court **GRANTS** Plaintiffs' Motion for Leave to File Response to Defendants' Second Notice of Supplemental Authority (Doc. No. 42). The Court notes that Plaintiffs have already submitted their response, and the Court has considered the arguments therein.

## II.   STANDARDS OF REVIEW

### A. *Judicial Notice*

Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Of note, "[t]he court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d). The Eleventh Circuit has noted that "the kinds of things about which courts ordinarily take judicial notice are (1) scientific facts:

for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997). This process is highly limited because "taking judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." Id. These standards guide the Court's inquiry as to whether Exhibit A should be stricken from Defendants' Motion to Dismiss.

### B. *Motion to Dismiss*

When considering a 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the complaint drawing all reasonable inferences in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); U.S. v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam). Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S 662, 678 (2009) (quoting Twombly, 550 U.S. at 555); accord Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007).

Further, the complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Id. (citing Twombly, 550 U.S. at 570). Put another way, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This so-called "plausibility standard" is not akin to a

probability requirement; rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim. Id.

Even if it is extremely unlikely that a plaintiff will recover, a complaint may nevertheless survive a motion to dismiss for failure to state a claim, and a court reviewing such a motion should bear in mind that it is testing the sufficiency of the complaint and not the merits of the case. Twombly, 550 U.S. at 556; see Wein v. Am. Huts, Inc., 313 F. Supp. 2d 1356, 1359 (S.D. Fla. 2004). With these principles in mind, the Court considers Defendants' Motion to Dismiss.

## III.   ANALYSIS

Before considering Defendants' Motion to Dismiss, the Court must first address Plaintiffs' Notice of Objection and Motion to Strike (Doc. No. 42).

### A. **Motion to Strike**

As mentioned briefly above, Defendants attached a Google map printout to their Motion to Dismiss purporting to show the geographic location of various theatres around Atlanta, including the Brookhaven CinéBistro and AMC's Buckhead theatres. (Mem. in Supp. of Defs.' Mot. to Dismiss Ex. A, Doc. No. 19-2.) Relying on this exhibit, Defendants argue the Court should take judicial notice of the geographic proximity of certain theatres to the Brookhaven CinéBistro. Taking it one step further, Defendants specifically aver that these other theatres are

"approximately 15 minutes away [from the Brookhaven CinéBistro], according to the 'Directions' feature on Google Maps." (Id. 3.)

Plaintiffs acknowledge that courts do, on occasion, take judicial notice of maps. United States v. Proch, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011). In fact, courts in other circuits commonly take judicial notice of information obtained specifically from Google Maps. E.g., Pahls v. Thomas, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a Google map to show the general location of events relevant to the litigation); Global Control Sys., Inc. v. Luebbert, No. 4:14-CV-657-DGK, 2015 WL 753124, *1 n.1 (W.D. Mo. Feb. 23, 2015) (taking judicial notice of a Google Maps search to establish the approximate distance between two locations). Plaintiffs do, however, contest the use of Defendants' exhibit to establish that the driving time between the Brookhaven CinéBistro and certain other theatres is approximately fifteen minutes.

As Plaintiffs note in their Motion to Strike, the exhibit in question does not purport to show the driving time between any two locations. Rather, it is simply a map showing the geographic locations of various theatres in the area surrounding Atlanta. In fact, the map does not provide a scale from which the Court could determine the distance in miles between any two points. Defendants, without demonstrating how they used Google Maps to make such a determination, cite the exhibit in question for the proposition that there are four theatres, other than AMC's Buckhead locations, within a fifteen minute drive of the Brookhaven

CinéBistro. The Court declines to take judicial notice of this "fact." Defendants have not submitted evidence establishing the drive time between the Brookhaven CinéBistro and any other location. Further, the Court is skeptical as to whether driving times are facts that "can be accurately and readily determined" using Google Maps. Fed. R. Evid. 201(b)(2); But see Rindfleisch v. Gentiva Health Sys., Inc., 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y. 2010) ("The Court takes judicial notice of the fact that . . . the estimated driving time from Auburn to Central Islip [calculated using Google Maps] is approximately five and one-half hours.").

Even so, the exhibit in question does not purport to establish driving times between two places but rather shows the geographic location of various theatres in Atlanta. For that reason, Plaintiffs' Notice of Objection and Motion to Strike (Doc. No. 42) is **DENIED**. The Court will take judicial notice of the fact that there are other theatres in the Atlanta area besides the Brookhaven CinéBistro, AMC Phipps Plaza 14, and AMC Fork & Screen Buckhead. The Court will not, however, take judicial notice of the purported driving time between the Brookhaven CinéBistro and any other theatre.

B. <u>**Motion to Dismiss for Failure to State a Claim**</u>

Plaintiffs' claims in this action are brought pursuant to the Sherman Antitrust Act and various Georgia laws. The Court addresses Defendants' Motion to Dismiss as it relates to each of Plaintiffs' claims.

i.      *Exclusive Dealing: Sherman Antitrust Act § 1 Claim (Count IV)*

Plaintiffs argue the clearance agreements in question violate section 1 of the Sherman Antitrust Act, which declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. The Complaint also alleges Defendants violated this statute by entering into agreements with landlords pursuant to which those landlords agreed not to lease theatre space to AMC's competitors. Although the language of section 1 seems to create a blanket prohibition on concerted restraint of trade, the Supreme Court has clarified that many forms of concerted action should be evaluated using the "rule of reason." Standard Oil Co. v. United States, 221 U.S. 1, 58–62 (1911); Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1333 (11th Cir. 2010). Pursuant to that rule, "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).

Here, the Complaint alleges AMC coerced distributors to enter into clearance agreements which have deprived Cobb of the opportunity to compete with AMC for film licenses and theatre customers. (Compl. ¶ 124.) In response, Defendants argue Plaintiffs' exclusive dealing claim must fail because the Complaint does not adequately allege the existence of a conspiracy, an unreasonable restraint on trade, or harm to the competition. For the reasons that

follow, Defendants' Motion to Dismiss is denied as to Plaintiffs' exclusive dealing claim.

### a. The Existence of a Conspiracy

A plaintiff attempting to state a claim under section 1 of the Sherman Act must sufficiently plead the existence of an agreement to restrain trade. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 569 (11th Cir. 1998) ("It is settled law that a threshold requirement of every antitrust conspiracy claim, whether brought under section 1 or section 2 of the Sherman Act, is 'an agreement to restrain trade.'"). Here, Defendants argue Plaintiffs' conspiracy allegations fail to establish the existence of an actual agreement because the Complaint does not identify which specific film distributors had clearance agreements with Plaintiffs. Defendants contend the Complaint refers to "distributors" and "the major film distributors" but never identifies these entities by name. In response, Plaintiffs assert that there are fewer than ten "major film distributors," all of whom are known to Defendants. Further, Plaintiffs point out that the Complaint identifies Sony Pictures as one of the film distributors AMC allegedly coerced into giving it special treatment.

In Twombly, 550 U.S. at 556, the Supreme Court held stating a claim under section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the

13

pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Put another way, the Court is tasked with determining if the Complaint contains enough factual heft to plausibly suggest the existence of a conspiracy or agreement. <u>Id.</u> at 557; <u>Jacobs</u>, 626 F.3d at 1332–33. Moreover, although the plaintiff must allege more than a mere opportunity to conspire, courts in this circuit recognize that "most conspiracies are inferred from the behavior of the alleged conspirators." <u>Seagood Trading Corp. v. Jerrico, Inc.</u>, 924 F.2d 1555, 1573–74 (11th Cir. 1991).

The Complaint alleges Defendants sent a letter to "the major film distributors" demanding clearances for its Buckhead theatres. (Compl. ¶ 58.) Although Plaintiffs set forth the specific contents of that letter, they do not identify "the major film distributors" by name. (<u>Id.</u>) Plaintiffs assert that, as a direct result of the letter, distributors began allocating the Brookhaven CinéBistro fewer high-grossing, popular films. (<u>Id.</u> ¶ 60.) Further, the Complaint specifically identifies Sony Pictures as one of the distributors that honored AMC's request for preferential treatment.[4] (<u>Id.</u> ¶ 61.) According to Plaintiffs, AMC forced distributors to enter into these agreements by threatening, at least implicitly, that the refusal to grant clearances would result in adverse economic consequences. (<u>Id.</u> ¶ 126.)

---

[4]    Defendants contend Plaintiffs' allegations in reference to Sony are insufficient because Plaintiffs concede "that Sony exclusively licensed to Cobb two of its most successful films of the last year: the award-winning Captain Phillips and Elysium." (Mem. in Supp. of Defs.' Mot. to Dismiss 8 n.4.) This argument is without merit. Defendants cannot seriously contend dismissal is warranted by pointing out that Cobb was given crumbs when the Complaint alleges AMC was given the rest of the pie.

Drawing all reasonable inferences in favor of Plaintiffs, these allegations provide enough factual matter to suggest an agreement was made. Twombly, 550 U.S. at 556. Further, Plaintiffs have sufficiently identified Defendants' alleged co-conspirators using more than mere labels and conclusions. Dismissal is thus not warranted on this ground.

### b. An Unreasonable Restraint on Trade

Despite the broad language of section 1 of the Sherman Act, that provision prohibits only "unreasonable" restraints on trade. Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (citing State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). In most cases, the reasonableness of a particular practice is weighed by the fact finder in light of the circumstances surrounding the case. Id. (citing Cont'l T.V., Inc., 433 U.S. at 49). A number of factors are relevant to this inquiry, including "specific information about the relevant businesses" as well as "the restraint's history, nature and effect." Id. (citing Khan, 522 U.S. at 10).

In a limited class of cases, however, certain restraints on trade are considered unlawful *per se*. Id. Such rules are necessary when conduct "would always or almost always tend to restrict competition and decrease output." Id. at 886 (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (2001)). For example, "horizontal price fixing among competitors, group boycotts, and horizontal market division" are *per se* violations of the Sherman Act. Jacobs, 626 F.3d at 1333. In this case, Plaintiffs have alleged a conspiracy exists "between

businesses operating at different levels of the same product's production chain or distribution chain, known as 'vertical' agreements." <u>Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.</u>, 376 F.3d 1065, 1071 (11th Cir. 2004). These vertical agreements are scrutinized using the rule of reason. <u>Id.</u>

Defendants argue Plaintiffs' exclusive dealing claim must be dismissed because the Complaint does not allege an unreasonable restraint on trade. More specifically, Defendants contend the clearance agreements at issue are procompetitive as a matter of law. To support this proposition, Defendants cite <u>Reading Int'l, Inc. v. Oaktree Capital Mgmt.</u>, No. 03 Civ. 1895(PAC), 2007 WL 39301 (S.D.N.Y. 2003), a case from the Southern District of New York in which the owner, operator, and landlord of an independent movie theatre in lower Manhattan brought an antitrust action against the operators and principle investors of multiple large theatre chains. In that case, the court noted that "the Supreme Court has long held that [clearance agreements] are reasonable as long as they are not unduly extended as to area or duration." <u>Reading Int'l, Inc.</u>, 2007 WL at *15 (quoting <u>United States v. Paramount Pictures, Inc.</u>, 334 U.S. 131, 145 (1948)) (internal quotations omitted). Here, Defendants argue, Plaintiffs have completely failed to allege that the clearances in question are unduly extended in any manner.

Moreover, Defendants point out that many "[c]ourts have found clearances . . . to be reasonable restraints of trade under certain conditions: when the theatres are in substantial competition, and the clearances are used to assure the

exhibitor that the distributor will not license a competitor to show the movie at the same time or so soon thereafter that the exhibitor's expected income will be greatly diminished." Theee Movies of Tarzana v. Pac. Theatres, Inc., 828 F.2d 1395, 1399 (9th Cir. 1987) (citing Paramount Pictures, 334 U.S. at 145–46). Defendants contend the Complaint is totally void of allegations that the Brookhaven CinéBistro is not in substantial competition with AMC's Buckhead theatres; to the contrary, the Complaint acknowledges that the three theatres "compet[e] to exhibit films to the public in the Buckhead-Brookhaven zone." (Compl. ¶ 49.)

In response to Defendants' arguments, Plaintiffs first take issue with the assertion that clearances are procompetitive as a matter of law. The Court agrees that Defendants' stance on the presumptive legality of such agreements is too strong. The Supreme Court, in Paramount Pictures, held that clearances are reasonable when used for the proper purpose if they are not unduly extended in area or duration. 334 U.S. at 145–46. Further, that case sets forth seven factors a court should consider when evaluating the reasonableness of a clearance agreement.[5] In the Court's view, such an inquiry can hardly be said to imply that

---

[5]    The Court found the following factors relevant when considering whether a clearance is unreasonable: "(1) [t]he admission prices of the theatres involved, as set by the exhibitors; (2) [t]he character and location of the theatres involved, including size, type of entertainment, appointments, transit facilities, etc.; (3) [t]he policy of operation of the theatres involved, such as the showing of double features, gift nights, give-aways, premiums, cut-rate tickets, lotteries, etc.; (4) [t]he rental terms and license fees paid by the theatres involved and the revenues derived by the distributor-defendant from such theatres; (5) [t]he extent to which the theatres involved compete with each other for patronage; (6) [t]he fact that a theatre involved is affiliated with a defendant-distributor or with an independent circuit of theatres should be disregarded; and (7)

clearances are procompetitive as a matter of law. See also Schine Chain Theatres v. United States, 334 U.S. 110, 124 (1948) (finding clearances obtained through the exercise of monopoly power to be unlawful).

Plaintiffs have not directly responded to Defendants' argument that the Complaint fails to state a claim for exclusive dealing because the Brookhaven CinéBistro and AMC's Buckhead theatres are in "substantial competition." Moreover, the Complaint does not specifically allege that the scope and duration of the clearance agreements in question are unduly extended. As discussed above, courts generally uphold the legality of clearances between theatres in "substantial competition" as long as those agreements are not "unduly extended as to area or duration." Paramount Pictures, 334 U.S. at 145. Rather than addressing these issues head on, Plaintiffs attack clearance agreements as no longer providing procompetitive benefits in the modern film industry. Specifically, Plaintiffs contend the "blanket clearances" at issue here restrict intrabrand competition while doing nothing to enhance interbrand competition. As explained by the Supreme Court,

> Interbrand competition is the competition among the manufacturers of the same generic product . . . and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors wholesale or retail of

there should be no clearance between theatres not in substantial competition." Paramount Pictures, 334 U.S. at 145–46.

> the product of a particular manufacturer. The degree of
> intrabrand competition is wholly independent of the level of
> interbrand competition confronting the manufacturer. Thus,
> there may be fierce intrabrand competition among the
> distributors of a product produced by a monopolist and no
> intrabrand competition among the distributors of a product
> produced by a firm in a highly competitive industry. But when
> interbrand competition exists . . . , it provides a significant
> check on the exploitation of intrabrand market power because
> of the ability of consumers to substitute a different brand of the
> same product.

Cont'l T.V., Inc., v. GTE Sylvania, 433 U.S. 36, 51 n.19 (1977). Importantly,

courts sustaining vertical agreements under the rule of reason have done so by

recognizing that such restrictions "promote interbrand competition by allowing the

manufacturer to achieve certain efficiencies in the distribution of his products." Id.

at 54. In regard to clearances specifically, courts have made this same observation.

E.g., Movies of Tarzana, 828 F.2d at 1399–1400 (finding clearances that promoted

interbrand competition without overly restricting intrabrand competition to be

reasonable). Plaintiffs, however, contend the clearances at issue here severely

restrict intrabrand competition without providing counterbalancing enhancements

to interbrand competition. In Plaintiffs' view, courts approving of clearances in the

past did so "because each distributor used clearances as a tool for incentivizing the

promotion of its own films" thus increasing interbrand competition. (Pls.' Resp. in

Opp'n to Defs.' Mot. to Dismiss 16, Doc. No. 25.) Because distributors no longer

rely on exhibitors to promote their films at a local level but instead run national advertising campaigns, Plaintiffs argue this rationale is outdated.[6] (Id.)

Although Defendants note courts routinely find clearances reasonable, they have not cited a single case in which that determination was made on a motion to dismiss.[7] Movies of Tarzana, 828 F.2d at 1400 (agreeing with the district court's summary judgment finding that certain clearances were reasonable); Reading Int'l, Inc., 2007 WL at *15 (finding certain clearances reasonable on a motion for summary judgment). In fact, the Court has been unable to find a single Eleventh Circuit case addressing clearances, and both parties have been forced to rely on opinions, many unpublished, from other circuits. Although Defendants are correct that courts generally find clearance agreements reasonable when theatres are in substantial competition, the Paramount Pictures court set forth several other factors that are relevant to the reasonableness inquiry. 334 U.S. at 145–46. Further, as the Eleventh Circuit has noted, "in order to consider a rule of reason claim based on a vertical restraint . . . , a court must conduct a 'systematic comparison' of the negative effects of the restraint on competition and compare that with the positive

---

[6]    Even so, the Court is not convinced by Plaintiffs' argument that clearances serve *no* procompetitive purpose. As the Ninth Circuit noted in Movies of Tarzana, clearances force theatres that are denied a license to certain movies to show alternatives, thereby increasing movie choices for consumers. 828 F.2d at 1399–1400. This logic may apply notwithstanding recent advancements in the film industry.

[7]    In their Second Notice of Supplemental Authority (Doc. No. 41), Defendants cite the Court to Starlight Cinemas v. Regal Entertainment Group, a case in which the court dismissed a complaint based on allegedly unlawful clearances. No. 2:14-cv-05463 (C.D. Cal. Feb. 2, 2015) (order denying plaintiff's motion for leave to file a first amended complaint). Unlike here, the plaintiff in that case did not "allege the necessary facts detailing a specific time, place, or person involved in the alleged conspiracies." Id. Finding the complaint failed to allege an agreement, the court in Starlight had no reason to conduct a reasonableness inquiry.

20

effects on competition stemming from the restraint." Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1213 (11th Cir. 2002) (citing Graphic Prods. Distribs. v. Itek Corp., 717 F.2d 1560, 1571 (11th Cir. 1983)).

Here, the Court concludes Plaintiffs have alleged sufficient facts to suggest the clearances in question are unreasonable. Accordingly, dismissal of Plaintiffs' exclusive dealing claim is not justifiable on this ground. Although Defendants may prove after discovery that the clearances at issue were justified, Plaintiffs' allegations are sufficient to withstand a motion to dismiss.

### c. Injury to Competition

To state a claim under section 1 of the Sherman Act, a plaintiff must allege "antitrust injury," i.e. an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Further, because antitrust laws are not intended to protect competitors, a plaintiff asserting antitrust violations must allege actual or potential injury to the *competition*. Spanish Broad. Sys., 376 F.3d at 1074. In other words, the conduct at issue must impact the market rather than the competitors therein. Id. (citing Dickson v. Microsoft Corp., 309 F.3d 193, 206 (4th Cir. 2002)).

Here, Defendants argue Plaintiffs' only assertion regarding actual harm is that the clearances in question have the effect of limiting moviegoers' theatre choices in the Buckhead-Brookhaven zone. Citing Reading, Defendants contend

this allegation is insufficient as a matter of law to constitute harm to competition. 2007 WL at *14 ("[T]he mere possibility that a consumer might have to see his or her first choice movie at his or her second choice theatre . . . is not an actionable restraint on trade . . . [and] does not mean that there has been an actionable harm to consumer choice or competition."). Defendants also argue Plaintiffs' failure to define a relevant market precludes them from alleging potential harm to competition.

As the Eleventh Circuit noted in Jacobs, "[a]ctual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." 626 F.3d at 1339 (citing United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993)). The quintessential harm is not higher prices; "[r]ather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman act." Id. Therefore, a plaintiff alleging actual harm to competition "should point to the specific damage done to consumers in the market." Id. (quoting Spanish Broad Sys., 376 F.3d at 1072) (internal quotations omitted). Here, the Court disagrees that Plaintiffs' only assertion regarding actual harm is that moviegoers in the Buckhead-Brookhaven zone simply have fewer theatre choices. Instead, as Plaintiffs point out in their brief opposing Defendants' Motion to Dismiss, the Complaint alleges in detail how Plaintiffs believe Defendants' conduct is reducing the quality of movie theatres offered to the public. Specifically, the Complaint compares and contrasts the various amenities that

Cobb Theatres and AMC respectively offer consumers, often drawing stark differences. In the Court's view, these allegations are adequate to plausibly suggest Defendants' conduct has substantially diminished the quality of a good offered to the public thereby causing actual harm to competition. Id. Defendants cite Spanish Broad. Sys., 376 F.3d at 1076, and a string of other cases for the proposition that "use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws." Plaintiffs have, however, alleged *more* than a mere substitution of competitors. Specifically, the Complaint alleges consumers are being forced to purchase a product that is less desirable and of inferior quality. Importantly, Defendants may be able disprove Plaintiffs' allegations regarding harm to competition after discovery, but, at the very least, this dispute cannot be resolved on a motion to dismiss.[8]

Even assuming a plaintiff shows actual or potential harm to competition, "he must identify the relevant market in which the harm occurs." Jacobs, 626 F.3d at 1336. Importantly, the "relevant market" has both product and geographic components. Id. (citing Rossi v. Standard Roofing, Inc., 156 F.3d 452, 464 (3d Cir. 1998)). The parameters of these markets are considered questions of fact, Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1573 (11th Cir. 1991), but antitrust plaintiffs must nevertheless "present enough information in their

---

[8]    Defendants also argue that Plaintiffs' failure to properly define the relevant market precludes them from alleging potential harm to competition. However, as discussed *infra*, the Court concludes the Complaint sufficiently pleads the contours of the relevant geographic and product markets.

complaint to plausibly suggest the contours of the relevant geographic and product markets." <u>Jacobs</u>, 626 F.3d at 1336. In this case, Defendants argue Plaintiffs' exclusive dealing claim should be dismissed because the Complaint's geographic and product market allegations are insufficient. The Court disagrees.

Geographically, the relevant market is defined as "the area in which the product or its reasonably interchangeable good is traded." <u>L.A. Draper & Son v. Wheelabrator-Frye, Inc.</u>, 735 F.2d 414, 423 (11th Cir. 1984). Here, the Complaint alleges the relevant geographic market is the "Buckhead-Brookhaven film licensing zone," which is comprised of "moviegoers who reside in or around Buckhead and Brookhaven." (Compl. ¶ 39.) Defendants, however, argue this definition is self-serving and does not comport with market realities. To support this contention, Defendants point to Exhibit A, a Google map showing the location of various theatres around Atlanta. According to Defendants, Plaintiffs have not demonstrated why the market should be so narrowly drawn so as to exclude these theatres. This argument is not persuasive. When determining the geographic market, "such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered." <u>Id.</u> (quoting <u>Hornsby Oil Co. v. Champion Spark Plug Co.</u>, 714 F.2d 1384, 1394 (5th Cir. 1983)) (internal quotations omitted). Moreover, "[m]arkets involving services that can only be offered from a particular location, like those provided by hospitals, theaters, and ski areas, will often be defined by how far

consumers are willing to travel . . . ." Earl W. Kintner, Federal Antitrust Law § 10.15 (2013). Significantly, the Complaint alleges moviegoers in the Buckhead-Brookhaven film zone are not willing to travel outside of the area to watch movies because of significant population density and heavy traffic congestion. All of these factors are relevant to the fact intensive inquiry of determining the geographic market. The Court therefore concludes Plaintiffs have alleged sufficient facts to survive a motion to dismiss in this regard.

The relevant product market, on the other hand, is "determined by the availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output." L.A. Draper, 735 F.2d at 423. In addition to examining "the uses to which the product is put by consumers in general," Jacobs, 626 F.3d 1327, 1337 (quoting Maris Distrib. Co., 302 F.3d at 1221), the court should give special consideration "to evidence of the cross-elasticity of demand and reasonable substitutability of the products . . . ."[9]

---

[9]     As explained by the Eleventh Circuit in Jacobs,

> [t]he cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another. A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one. For purposes of the relevant product market analysis, a high cross-elasticity of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market.

626 F.3d at 1337 n.13 (citing United States v. E.I. du Pont de Nemours & Co. (Cellophane), 351 U.S. 377, 391 (1956)).

Id. at 1337–38. In the Complaint, Plaintiffs identify the relevant product markets as "the market . . . to license films from distributors for exhibition to the public in the Buckhead-Brookhaven zone" and "the market for exhibition of films to patrons." (Compl. ¶¶ 41, 49.) Defendants argue the product markets identified in the Complaint are insufficient because they fail to allege cross-elasticity of demand. According to Defendants, Plaintiffs are asking the Court to assume, based on conclusory statements, that consumers do not perceive watching the same movie on DVD or pay-per-view in their home to be "a reasonable substitute for viewing films in theatre." (Compl. ¶ 18.)

To support their argument, Defendants cite Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997), a case in which the Third Circuit held a motion to dismiss may be granted when "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor . . . ." In that case, the plaintiffs alleged "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores" constituted a relevant product market. Queen City Pizza, 124 F.3d at 437. The court, however, disagreed because "the dough, tomato sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's stores are interchangeable with dough, sauce

and cups available from other suppliers and used by other pizza companies." Id. at 438. The facts here are entirely distinguishable from that case.

As the court in Queen City Pizza recognized, "the test for a relevant [product] market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purpose." Id. (quoting United States v. E.I. du Pont de Nemours & Co. (Cellophane), 351 U.S. 377, 391 (1956)). In regard to the relevant product market in this case, the Complaint alleges:

> When consumers watch motion pictures in their homes, they typically lose several advantages of the theater experience, including the size of screen, the sophistication of sound systems, the opportunity to watch in 3-D, and the social experience of viewing a film with other patrons. Additionally, the most popular, newly released or "first run" motion pictures (films) are not available for home viewing.

> Differences in the pricing of various forms of entertainment also reflect their lack of substitutability in the eyes of the consumers . . . . Renting a motion picture DVD for home viewing is usually significantly less expensive than viewing a film in a theater.

> [A] modern picture's theatrical exhibition life generally is no more than a few weeks, approximately 90-120 days after which it is released in other entertainment formats (e.g., DVD and pay-per-view television).

(Compl. ¶¶ 18, 19, and 23.) These allegations are sufficient to plausibly suggest the contours of a relevant product market. Unlike the plaintiffs in Queen City Pizza, Plaintiffs have alleged facts tending to show consumers might not consider watching a movie in a theatre and watching it at home to be "reasonably

interchangeable" experiences. In contrast to the evident interchangeability of pizza ingredients, the Court is not convinced, as Defendants suggest, that there is such a high cross-elasticity of demand between home-viewing and watching a film in theatres that Plaintiffs' exclusive dealing claim must fail on a motion to dismiss.

In their reply brief, Defendants also suggest that Plaintiffs have improperly disjoined the product at issue from their theory of competitive harm. More precisely, Defendants contend Plaintiffs have not alleged deterioration in the quality of first run, feature-length motion pictures, but instead alleged the quality of movie theatres has declined. This is important, Defendants argue, because the Complaint identifies the former product as the relevant market. The Court disagrees. The Complaint does not allege the relevant product market is "first run, feature-length motion pictures;" rather, Plaintiffs identify the relevant product markets as the market to *license* films from distributors and the *market* to exhibit films to the public. (Compl. ¶¶ 41, 49.) Having considered Defendants' arguments, the Court concludes Plaintiffs have alleged a relevant market and, accordingly, antitrust injury.[10]

---

[10]     Defendants half-heartedly suggest that Plaintiffs' lack standing to bring this suit given their purported failure to allege antitrust injury. Standing is a question of law. Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991). Importantly, "antitrust standing is not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." Id. To conduct this analysis, a court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519, 535 (1983). Having considered the record and arguments from the parties, the Court concludes that Plaintiffs have alleged an injury "of the type the antitrust laws

For the foregoing reasons, and in consideration of the Eleventh Circuit's disfavor of Rule 12(b)(6) dismissals in fact-intensive antitrust cases, the Court denies Defendants' Motion to Dismiss as to Plaintiffs' claim for exclusive dealing. Spanish Broad. Sys., 376 F.3d at 1070 (citing Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994–95 (11th Cir. 1983)).

       ii.    *Monopolization: Sherman Antitrust Act § 2 Claims (Counts II and III)*

The Complaint also alleges AMC has monopolized and attempted to monopolize markets for film licenses and theatre patrons in violation of section 2 of the Sherman Antitrust Act. To state a prima facie case for monopolization, a plaintiff must plead sufficient facts to infer: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966). In this context, "monopoly power" is the "power to control prices in or exclude competition from the relevant market." Morris Commc'n Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1294 (11th Cir. 2004) (citing Cellophane, 351 U.S. at 391 (1956)). Further, to satisfy the second element of a monopolization claim, the plaintiff must allege "predatory or exclusionary acts or

---

were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp., 429 U.S. at 489. Plaintiffs therefore have standing to bring this suit.

practices that have the effect of preventing or excluding competition within the relevant market." Id. (citing United States v. Microsoft, 253 F.3d 34, 58 (D.C. Cir. 2001)).

Comparatively, a plaintiff states a claim for *attempted* monopolization by alleging sufficient facts to suggest "predatory or anticompetitive conduct," "specific intent to monopolize," and "a dangerous probability of achieving monopoly power" in the relevant market. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Spanish Broad. Sys., 376 F.3d at 1074. As with section 1 claims, the "relevant market" has both product and geographic components. Gulf States Reorganization Group, Inc. v. Nucor Corp., 721 F.3d 1281, 1285 (11th Cir. 2013).

In large part, Plaintiffs' section 2 claims rely on the same allegations of anticompetitive behavior as their section 1 claims. Specifically, the Complaint alleges AMC has used its monopoly power to: 1) coerce distributors into denying Cobb the opportunity to fairly compete for film licenses and theatre customers; and 2) coerce landlords to enter into agreements pursuant to which those landlords agree not to lease theatre space to AMC's competitors. In their Motion to Dismiss, Defendants argue Plaintiffs' section 2 claims fail for multiple reasons. First, Defendants contend the Complaint does not allege predatory or exclusionary conduct and therefore fails to state a claim for attempted monopolization. Second,

Defendants argue Plaintiffs' failure to plead a relevant market forecloses any allegation that AMC has monopoly power.

### a. Exclusionary or Predatory Conduct

As discussed above, a claim for attempted monopolization involves three distinct elements. Spectrum Sports, 506 U.S. at 456 (noting that a plaintiff claiming attempted monopolization must show "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power"). Here, Defendants argue Plaintiffs have failed to state a claim for attempted monopolization because they do not allege AMC has engaged in predatory or anticompetitive conduct. More precisely, Defendants contend "AMC's alleged actions in requesting clearances cannot, as a matter of law, constitute exclusionary or predatory acts of monopolization when the clearances, even if granted, would be lawful." (Mem. of Law in Supp. of Defs.' Mot. to Dismiss 17, Doc. No. 19-1.) The Court has already addressed this argument in analyzing Plaintiffs' section 1 claims.

The "[predatory or] anticompetitive conduct criterion captures the critical antitrust idea of harm to competition, rather than to competitors." Spanish Broad Sys., 376 F.3d at 1075. This requirement is perhaps "the single most important aspect of attempted monopolization." Id. (citing Northeastern Tel. Co. v. Am. Tel. & Tel. Co., 651 F.2d 76, 85 (2d Cir. 1981)). In this case, the Complaint does not allege mere injury to a single competitor or that an unfair practice has resulted in a

simple substitution of one competitor for another. See Id. Instead, Plaintiffs allege Defendants' conduct is causing harm to competition by substantially diminishing the quality of a good offered to the public. (Compl. ¶¶ 38, 47, 66–68, 79, 85, and 94.) Defendants may eventually prove otherwise, but Plaintiffs have alleged sufficient facts to suggest exclusionary or predatory conduct, and Defendants' Motion to Dismiss Plaintiffs' claim for attempted monopolization is therefore denied.

### b. Allegations of Monopoly Power

To state a claim for monopolization, a plaintiff must first plead sufficient facts to infer the defendant possesses monopoly power in the relevant market. Grinnell Corp., 384 U.S. at 570–71. Defining the relevant market is therefore a necessary component of analyzing market power. U.S. Anchor Mfg. v. Rule Indus., 7 F.3d 986, 994 (11th Cir. 1993). In reference to Plaintiffs' section 2 claims, Defendants raise identical arguments regarding the sufficiency of Plaintiffs' geographic and product market allegations as those discussed in the Court's analysis above. The Court will not needlessly readdress these issues, but instead reiterates that the Complaint contains enough factual matter concerning the contours of the relevant market to survive at motion to dismiss.

Defendants also argue, even assuming the Buckhead-Brookhaven zone is a relevant geographic market, that Plaintiffs' monopolization claim fails because the Complaint does not allege Defendants have monopoly power in that market.

Monopoly power is the "power to control prices in or exclude competition from the relevant market." Morris Commc'n Corp, 364 F.3d at 1294. Further, "market share is frequently used in litigation as a surrogate for market power . . . ." Jacobs, 626 F.3d at 1339–40 (quoting Graphic Prods. Distribs., 717 F.2d at 1570). Here, Plaintiffs allege AMC has market power in the Buckhead-Brookhaven zone because it owns a 69% share of that market as calculated using the number of theatre seats Cobb and AMC respectively control.[11] Furthermore, Plaintiffs argue high entry barriers to the market make it reasonable to presume AMC has monopoly power. Bailey v. Allgas, Inc., 284 F.3d 1237, 1250 (11th Cir. 2002) (noting that high market share, coupled with sufficient barriers to market entry, can result in a finding of market power).

As an initial matter, Defendants assert the percentage of theatre seats is not a competent measure of monopoly power because it reflects potential capacity, not actual sales in the marketplace. The Court agrees that such a statistic may not be *the best* indicator of market power; it is, however, a relevant factor suggesting AMC controls a substantial share of the market. Moreover, Defendants argue the allegations in the Complaint preclude a finding of monopoly power because Plaintiffs concede there is extensive competition between the Brookhaven CinéBistro and AMC's Buckhead theatres in the alleged geographic market. This

---

[11]    Plaintiffs made this calculation using the seating capacities of the Brookhaven CinéBistro and AMC's Buckhead theatres. According to the Complaint, Defendants own 1,696 of the 2,454 theatre seats in the Buckhead-Brookhaven zone. (Compl. ¶¶ 35–37.)

argument has no merit. The allegations in the Complaint do not describe a "sharply competitive" marketplace as Defendants suggest. Cf. U.S. Ring Binder L.P. v. World Wide Stationary Mfg. Co., 804 F. Supp. 2d 588, 595 (N.D. Ohio 2011) ("Coupled with the Complaint's description of a sharply competitive marketplace, the allegation that monopoly power does or could exist in the [relevant market] is not plausible."). Rather, Plaintiffs repeatedly accuse Defendants of engaging in conduct that has stifled competition. The mere existence of a competitor in the marketplace does not eliminate the potential for monopoly power. If it were otherwise, monopoly power could only exist if a defendant controlled 100% of the market.

Defendants also question whether a 69% share of market is high enough to infer market power. Although a market share of less than 50% is inadequate as a matter of law to constitute monopoly power, the analysis is somewhat fluid. Bailey, 284 F.3d at 1250. In fact, the Supreme Court has noted that, in some circumstances, "over two-thirds of the market is a monopoly." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 480 (1992) (citing Am. Tobacco Co. v. United States, 328 U.S. 781, 797 (1946)). The Court concedes that whether a 69% share of the market supports a finding of monopoly power is a borderline issue. However, resolving all doubt in favor of Plaintiffs, the allegation at least withstands Defendants' motion to dismiss. See e.g., Moore U.S.A., Inc. v. Std. Register Co., 139 F. Supp. 2d 348, 357 (W.D.N.Y. 2001) (finding allegation of

65% product market share sufficient to survive a motion to dismiss); Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc., 795 F. Supp. 639, 646 (S.D.N.Y. 1992) (finding 70% market share sufficient to support finding of market power); Brager & Co. v. Leumi Sec. Corp., 429 F. Supp. 1341, 1347 (S.D.N.Y. 1977) ("Concededly, companies that have been found to possess monopoly power usually have enjoyed market shares greater than seventy per cent, but whether such power actually exists is a quintessential question of fact."); Pac. Eng'g & Prod. Co. v. Kerr-McGee Corp., No. C-40-70, 1974 U.S. Dist. LEXIS 12022, at *61 (D. Utah March 4, 1974) (finding a 67% share of the market, although borderline, "probably supports the inference [of a monopoly]") rev'd in part on other grounds, 551 F.2d 790 (10th Cir. 1977).

Even so, allegations of market share alone are insufficient to establish monopoly power. Jacobs, 626 F.3d at 1340. In fact, even a market share of 100% is not determinative. See Id. "Relevant determinants of the market power of a prospective predator . . . include its absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment." U.S. Anchor, 7 F.3d at 994 (quoting Int'l Tel. & Tel. Corp., 104 F.T.C. 208, 412 (1984)). Relevantly, the Complaint alleges Defendants have created high entry barriers to the market in order to perpetuate their monopoly. According to Plaintiffs, AMC has established a system of threatening landlords

that it will request clearance agreements over competitors that are allowed to lease space near an existing AMC theatre. In short, AMC allegedly threatens that the new entrant will "have a hard time getting film product." (Compl. ¶ 87.) Consequently, landlords are often unwilling to rent space to AMC's competitors for fear that doing so will result in "reduc[ed] customer traffic to the landlord's shopping mall, plaza, or development." (Id. ¶ 88.) Further, Plaintiffs argue that film distributors are actually complying with AMC's clearance demands thereby securing preferential treatment over competing theatres and further suggesting AMC has monopoly power in the Buckhead-Brookhaven zone. By establishing a nationwide policy of bullying competitors with clearances, Plaintiffs argue, AMC has created high entry barriers to markets across the nation, including the one defined in the Complaint.

Conversely, Defendants assert that the allegations in the Complaint suggest any barriers to entering the Buckhead-Brookhaven market—to the extent they even exist—are low because Cobb admits it entered the market in 2011 and shortly thereafter gained a 30% market share. However, such an argument ignores the allegations in the Complaint that AMC erected barriers that Cobb had to overcome to open the Brookhaven CinéBistro. Specifically, Plaintiffs contend Defendants sent a letter to major film distributors setting forth AMC's expectation that it would play "100% of [the distributors'] wide commercial releases" rather than playing day-and-dates with the Brookhaven CinéBistro. (Compl. ¶ 58.) Further, the

36

Complaint alleges AMC has since begun threatening landlords that if they lease space to AMC's competitors, those competitors will have a hard time licensing movies. (Id. 87.) Whether these barriers actually show AMC has monopoly power is a question for another day.

Based on the foregoing analysis, the Court concludes Plaintiffs have satisfied their burden of alleging market power. Accordingly, Defendants' Motion to Dismiss Plaintiffs' monopolization claim is denied.

### iii.   *Circuit Dealing (Count I)*

Plaintiffs also argue Defendants violated the Sherman Act by engaging in a practice known as "circuit dealing." That term is not specifically defined by case law, but it occurs when a defendant pools the purchasing power of an entire circuit to "eliminate the possibility of bidding for films [on a] theatre by theatre [basis]." Paramount Pictures, 334 U.S. at 154 (discussing "formula deals" and "master agreements"). In Paramount Pictures, the Supreme Court addressed circuit dealing in the context of film licensing agreements "that cover exhibition in two or more theatres in a particular circuit . . . ." Id. Notably, the Court found such agreements to be unlawful because they "eliminate the opportunity for the small competitor to obtain the choice [first-run films], and put a premium on the size of the circuit" thereby undermining the competitive process. Id. Likewise, in United States v. Griffith, 334 U.S. 100 (1948), the Supreme Court held that certain circuit deals constitute unlawful monopoly leveraging, a form of anticompetitive conduct which

involves a monopolist using "its monopoly power in one market to gain a competitive advantage in another." Aquatherm Indus., Inc. v. Fla. Power & Light Co., 145 F.3d 1258, 1262 (11th Cir. 1998) (quoting Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275 (2d Cir. 1979)). Such conduct is unlawful because "the pooling of the purchasing power of an entire circuit in bidding for films is a misuse of monopoly power insofar as it combines the theatres in closed towns with competitive situations."[12] Paramount Pictures, 334 U.S. at 154–55.

In Griffith, the Court set forth the circumstances in which circuit dealing amounts to unlawful monopoly leveraging:

> A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. It may be a feeble, ineffective weapon where he has only one closed or monopoly town. But as those towns increase in number throughout a region, his monopoly power in them may be used with crushing effect on competitors in other places. He need not be as crass as the exhibitors in [United States v. Crescent Amusement Co., 323 U.S. 173 (1944)] in order to make his monopoly power effective in his competitive situations. Though he makes no threat to withhold the business of his closed or monopoly towns unless the distributors give him the exclusive film rights in the towns where he has competitors, the effect is likely to be the same where the two are joined. When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire. And even if we assume that a specific intent to accomplish that result is absent, he is chargeable in legal

---

[12]     A "closed" town or market is an area that has only a single theatre. Importantly, that theatre "faces no competition in the market for (1) exhibiting films to the public in that zone and (2) licensing films from distributors for exhibition in that zone." (Compl. ¶ 27.)

contemplation with that purpose since the end result is the
necessary and direct consequence of what he did.

334 U.S. at 107. Of note, both forms of circuit dealing are considered *per se*
violations of the Sherman Act. Paramount Pictures, 334 U.S. at 153–55; Griffith,
334 U.S. at 106–09. In their reply brief, Defendants suggest that circuit dealing
should be scrutinized under the rule of reason. Even if that were true, the Court's
analysis here would not change.

As to the circuit dealing arrangements prohibited by Paramount, Plaintiffs
contend the letter AMC sent to distributors is evidence of a film licensing
agreement that "cover[s] exhibition in two or more theatres in a particular circuit."
334 U.S. at 153–55. In response to this claim, Defendants argue that there is "not a
single fact alleged in the Complaint that any circuit deal, with any distributor, for
any film, was ever accepted, implemented, or even proposed." (Mem. of Law in
Supp. of Defs.' Mot. to Dismiss 9.)  This is simply not true. There are numerous
allegations in the Complaint regarding the letter purportedly sent to major film
distributors, and additional allegations regarding the conduct of those distributors
after receiving the letter. (Compl. ¶¶ 58–62.) These allegations are sufficient to
plausibly suggest the existence of an unlawful circuit dealing arrangement pursuant
to which AMC simultaneously negotiated clearances for both of its Buckhead
theatres.

Plaintiffs also allege Defendants have engaged in the type of circuit dealing
that amounts to monopoly leveraging. Specifically, the Complaint accuses AMC of

"using or attempting to use its circuit power and its monopoly power in a substantial number of non-competitive [closed] zones to drive high-quality theatres out of markets in which they compete with AMC . . . ." (Compl. ¶ 85.) In Defendants' view, this claim must fail because "Cobb has not alleged any threats or agreements that amount to a 'circuit deal' and because Cobb has not alleged that AMC possesses the requisite monopoly power in a leveraging market in the first place." (Mem. of Law in Supp. of Defs.' Mot. to Dismiss 17.) These arguments are unavailing.

As to the sufficiency of Plaintiffs' allegations regarding a leveraging market, the Complaint states that AMC operates theatres in non-competitive zones across the United States. (Compl. ¶ 28.) The Complaint also alleges that AMC is the second-largest theatre circuit in the country. (Id. ¶ 11.) Although Defendants fault Plaintiffs for not citing a specific non-competitive market in which AMC owns a theatre, such criticism is unnecessary. Plaintiffs are alleging AMC is using the power of its *entire* nationwide circuit—including its theatres in closed markets—to acquire exclusive privileges in markets where it has competitors. Identifying specific closed markets used for leveraging is therefore unnecessary to state a claim for relief. Moreover, the Court is not persuaded by the argument that the Complaint fails to allege AMC made any agreements or threats that amount to a circuit deal. For instance, Plaintiffs specifically contend the letter Defendants sent to film distributors operated as a demand that those distributors grant AMC

preferential treatment or, alternatively, "risk being denied the grossing potential of AMC's Buckhead theaters and, implicitly, *some or all of the theaters in its entire circuit . . . .*" (Compl. ¶ 59 (emphasis added).) When a film exhibitor uses the buying power of its entire circuit to negotiate films for its competitive and closed markets, it is guilty of circuit dealing. <u>Griffith</u>, 334 U.S. at 107–09. This is true even when the exhibitor does not expressly threaten distributors that it will withhold the business of its closed or monopoly markets unless it is given preferential treatment. <u>Id.</u> Accordingly, Plaintiffs have stated a claim for circuit dealing and Defendants' Motion to Dismiss must be denied on this count.

  iv. <u>*State Law Claims (Counts V and VI)*</u>

Plaintiffs rely on the same allegations of misconduct discussed above to support their state law claims for tortious interference with business relations and violations of the Georgia Constitution and O.C.G.A. § 13-8-2, which declare contracts in restraint of trade void as against public policy. The Court will address each of these claims in turn.

  a. *Tortious Interference*

To state a claim for tortious interference with business relations under Georgia law, the plaintiff must show that "the defendant: (1) acted improperly and without privilege; (2) acted purposefully and maliciously with the intent to injure; (3) induced a third party not to enter into or continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury." <u>Meadow Springs,</u>

41

LLC v. IH Riverdale, LLC, 323 Ga. App. 478, 480, 747 S.E.2d 47 (2013) (quoting

NationsBank v. SouthTrust Bank of Ga., 226 Ga. App. 888, 892, 487 S.E.2d 701

(1997)). In this context, "[i]mproper actions constitute conduct wrongful in itself;

thus, improper conduct means wrongful action that generally involves predatory

tactics such as physical violence, fraud or misrepresentation, defamation, use of

confidential information, abusive civil suits, and unwarranted criminal

prosecutions." Culpepper v. Thompson, 254 Ga. App. 569, 572, 562 S.E.2d 837

(2002) (citations and internal quotations omitted).

First, Defendants argue Plaintiffs' tortious interference claim should be

dismissed because the Complaint does not allege facts that would make the

requested clearances improper or unlawful. The Court has considered and rejected

this argument in its analysis above. Plaintiffs allege AMC sent a letter to film

distributors threatening, at least implicitly, that the refusal to grant certain

clearances would result in adverse consequences. Moreover, Plaintiffs also allege

that Defendants have threatened landlords that they will make it difficult for

AMC's competitors to license films if those competitors are allowed to lease space

near an existing AMC theatre. Although Defendants attempt to characterize their

conduct as harmless and in accordance with common business practices, the Court

is not yet convinced that AMC's policies and procedures regarding clearances are

beyond reproach. It is not entirely clear whether Defendants' alleged conduct

comes within the ambit of predatory and improper behavior proscribed by Georgia

tort law, but the Court nevertheless finds Plaintiffs' allegations sufficient to endure a motion to dismiss.

Defendants also argue for dismissal of Plaintiffs' tortious inference claim on the grounds that the Complaint does not identify which entities AMC induced not to do business with Cobb. Once again, the Court must reject Defendants' argument. The Complaint refers to "the major film distributors" and specifically identifies Sony Pictures as one of the distributors that reacted to Defendants' letter by giving AMC preferential treatment. These allegations standing alone satisfy Plaintiffs' burden. Even so, Plaintiffs go even further and allege they attempted to rent space in Miami, Florida, at the Dadeland Mall only to be told by AMC's President and CEO that AMC would use its full weight and power to prevent Plaintiffs from opening a CinéBistro at that location. Although the Complaint does not identify the landlord of that space by name, these allegations are also sufficient to support Plaintiffs' claim for tortious interference with business relations. Accordingly, Defendants' Motion to Dismiss is denied as to Count V of the Complaint.

### b. Contract in Restraint of Trade

Plaintiffs also allege Defendants are liable for violations of article III, § 6, ¶ 5 of the Georgia Constitution and O.C.G.A. § 13-8-2, which declare contracts in restraint of trade void as against public policy. Although "these provisions merely render such agreements unenforceable and provide no cause of action for damages

to those who are parties thereto, . . . Georgia recognizes a common law tort action in favor of third parties who are injured by a conspiracy in restraint of trade." U.S. Anchor, 7 F.3d at 1003 (citations and internal quotations omitted). Defendants first argue this claim should be dismissed because Georgia courts have clarified that "a contract may be upheld if the restraint is reasonable and the contract is valid in other respects." Wedgewood Carpet Mills, Inc. v. Color-Set, Inc., 149 Ga. App. 417, 421, 254 S.E.2d 412 (1979). However, this argument is irrelevant given the Court's previous finding that Plaintiffs have alleged the existence of unreasonable agreements.

Next, Defendants cite U.S. Anchor to support their contention that a plaintiff's sole remedy to challenge a contract in restraint of trade under Georgia law is through a tortious interference claim. 7 F.3d at 1003 ("We also have some doubt as to whether intentional interference with business relations is a distinct cause of action from the tort of conspiracy in restraint of trade, or whether there is only a single theory of relief."). Other than citing that court's "doubt," Defendants do not direct the Court to additional authority to support their argument. Moreover, courts in this Circuit have continued to allow Plaintiffs to state claims for both tortious interference and for violations of Georgia law prohibiting contracts in restraint of trade. See Atl. Fiberglass USA, LLC v. KPI, Co., Ltd., 911 F. Supp. 2d 1247 (N.D. Ga. 2012). Having disposed of these arguments, the Court must deny Defendants' Motion to Dismiss as to Count VI.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 19) is **DENIED**; Plaintiffs' Notice of Objection and Motion to Strike (Doc. No. 24) is **DENIED**; and Plaintiffs' Motion for Leave to File Response to Defendants' Second Notice of Supplemental Authority (Doc. No. 42) is **GRANTED**. The Court notes that its ruling is in keeping with this Circuit's disfavor of Rule 12(b)(6) dismissals in fact-intensive antitrust disputes. Spanish Broad. Sys., 376 F.3d at 1070. After Defendants file their Answer, the parties are directed to comply with the Court's previous order regarding deadlines for initial discovery related activities (Doc. No. 23).

**SO ORDERED**, this 20th day of March, 2015.

_Eleanor L. Ross_
_____
Eleanor L. Ross
United States District Judge
Northern District of Georgia