IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB THEATRES III, LLC; COBB THEATRES IV, LLC, | CIVIL ACTION FILE NO. |
| Plaintiffs, | |
| v. | 1:14-CV-00182-ELR |
| AMC ENTERTAINMENT HOLDINGS, INC.; AMC ENTERTAINMENT INC.; AMERICAN MULTI-CINEMA, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Henry D. Fellows, Jr.
Amy Durrence
FELLOWS LABRIOLA LLP
225 Peachtree Street, N.E., Suite 2300
Atlanta, GA 30303
Telephone:  404-586-9200
Facsimile:  404-586-9201
E-mail:  hfellows@fellab.com
           adurrence@fellab.com

Thomas L. Boeder
Eric J. Weiss
Catherine S. Simonsen
(*Admitted pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206-359-8000
Facsimile:  206-359-9000
E-mail:  tboeder@perkinscoie.com
           csimonsen@perkinscoie.com
           eweiss@perkinscoie.com

Plaintiffs (collectively, "Cobb"), file this Memorandum of Law in Support of their Motion to Compel Discovery (Doc. No. 65).

## BACKGROUND

In this case, Cobb alleges that AMC, shortly after a 2009 management restructuring, embarked upon a nationwide campaign to insulate its theaters from competition from smaller, more innovative theaters like Cobb's, including Cobb's Brookhaven CinéBistro in the "Buckhead-Brookhaven" market in Atlanta. (Compl., Doc. No. 1, ¶¶ 56–57, 84–86.)  The primary weapon employed by AMC has been blanket "clearances"—demands by AMC that film distributors agree to license high-grossing, first-run films exclusively to AMC theaters and not to its smaller, more innovative competitors.  (Id. ¶¶ 58–64, 86.)  In Buckhead-Brookhaven, the result of AMC's clearance demands and agreements is that "Cobb [has been] given crumbs when . . . AMC [has been] given the rest of the pie." (Order, Doc. No. 44, at 14 n.4.)

Cobb's Brookhaven CinéBistro is one of numerous other exhibitors that have been victimized by AMC's use of blanket clearances to restrain competition. For example, in December, 2012, AMC met with representatives of Disney, Fox, Paramount, Warner Bros., Lions Gate, Sony, the Weinstein Companies, and Universal regarding what it termed "predatory development."  (Ex. 1 at Rog. No.

8; Ex. 2 at 2.[1])  In its presentations to these distributors, entitled "Partnership Discussion[s]," AMC announced its "go-forward position on clearances in response to predatory development," including announcing its "near-term predatory competitors," a list of over a dozen theaters built or pending development near AMC theaters throughout the United States.  (Ex. 2 at 2, 6.)  In its presentation, "AMC ask[ed] distributors to grant clearances . . . in [these competitive] situations," including "[r]e-iterating [its] AMC Phipps Plaza 14 film clearance request . . . in [the] Buckhead zone" over Cobb's Brookhaven CinéBistro.  (Id. at 5, 2.)

Pursuant to its national clearance campaign against "predatory competitors," AMC also threatens distributors and landlords that AMC will "clear" smaller, more innovative rivals—i.e., prevent them from getting the film they need to compete against AMC's incumbent theaters—if the landlord leases theater space to those rivals.  (Compl. ¶¶ 87–97.)  AMC puts teeth behind its threats by following through with them when rivals nevertheless proceed with new builds (as in Buckhead-Brookhaven).  As a result of AMC's threats to clear new builds, Cobb has been prevented from opening new theaters in at least eight different sites throughout the country (hereinafter, Cobb's "new build" sites).  (Id.)

---

[1]     All references to exhibits are to the exhibits attached to the Declaration of Catherine S. Simonsen ("Simonsen Decl."), filed herewith.

Cobb alleges that AMC's conduct constitutes monopolization and attempted monopolization of, and contracts in restraint of trade in, the Buckhead-Brookhaven zone in which Cobb's Brookhaven CinéBistro competes with AMC's Buckhead theaters, as well as in the eight other markets in which Cobb's new builds would have competed with AMC's incumbent theaters.  (Id. ¶¶ 107–131.)  AMC's conduct also amounts to "circuit dealing," a per se violation of the federal antitrust laws in which a dominant theater circuit uses its circuit power to deprive smaller theaters of fair, competitive access to film and effectively negotiates for film licenses on other than a film-by-film, theater-by-theater basis.  (Id. ¶¶ 100–106.)

In March, 2015, this Court denied AMC's Motion to Dismiss Cobb's Complaint.  (Order, Doc. No. 44.)  The parties proceeded to serve discovery requests and responses.  Cobb's Request for Production ("RFP") No. 2 requested "[a]ll documents that refer or relate to requests or demands for clearances over the Brookhaven CinéBistro and/or other theaters."  (Ex. 3 at RFP No. 2.)  Cobb's RFP No. 13 requested "[a]ll of your communications with [landlords, property developers, and their agents] that refer or relate to any other exhibitor[.]"  (Id. at RFP No. 13.)  Cobb's RFP No. 25 requested "[a]ll documents that refer or relate to your policies and practices, whether formal or informal, express or implied, that refer or relate to clearances and/or allocations."  (Id. at RFP No. 25.)  Cobb's RFP

127913476.1

No. 26 requested "[a]ll communications between you and any distributor . . . that refer or relate to clearances or allocations."  (Id. at RFP No. 26.)

AMC objected to these requests on numerous grounds.[2]  The objection at issue here is AMC's claim that the requests are "overbroad in scope because [they] seek[] documents and information that is related to 'other theaters [or exhibitors],'" or "clearances [outside] the greater Atlanta area[.]"  (Id. at RFP Nos. 2, 13, 25–26.) AMC agreed to produce responsive documents only if they refer or relate to Cobb or its theaters, "the greater Atlanta area" (including AMC's Buckhead theaters), or what AMC calls its "general" or "over-arching" clearance policies and practices. (See id.; Ex. 4 at 5.)  AMC refuses to produce documents "that relate solely to other exhibitors' development of or potential development of their own theatres" and documents related to AMC's clearance practices with respect to other theaters, unless they also refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies and practices (to be determined in AMC's discretion).  (See Ex. 5 at 3; Ex. 4 at 5.)

Cobb also propounded the following Interrogatory No. 14, as revised through negotiations:

---

[2]    The full text of Cobb's original requests and AMC's original objections and responses is set forth in Exhibit 3.

> Identify each instance from January 1, 2008 to present in which you either informed a distributor that one or more of your theaters would not play day and date with one or more non-AMC theaters, or requested that a distributor not license one or more films to one or more non-AMC theaters for day-and-date play with one or more AMC theaters.

(Ex. 1 at Rog. No. 14; Ex. 6 at 2.)  Rather than providing a substantive answer, AMC responded that it "will produce business records containing information sought by this interrogatory[.]"  (Ex. 7 at Rog. 14.)  AMC then revised its position with respect to Cobb's RFP Nos. 2, 25, and 26 and agreed to produce "documents reflecting AMC's initial request for clearances/ notification to distributors of AMC's intent not to play day and date with respect to any theatre anywhere from 2008 to the present, regardless of whether such communications mention, refer, or relate to Cobb."  (Ex. 4 at 5.)  In other words, because AMC was insisting on not substantively answering Interrogatory No. 14—and instead referring Cobb to its document production—AMC revised its position with respect to the RFPs and agreed to produce a narrow category of responsive documents.

After almost three months of negotiations, AMC finally agreed to provide a substantive answer to Cobb's Interrogatory No. 14.  (Ex. 1 at Rog. 14.)[3]  In its answer, AMC identifies nineteen "instances from January 1, 2008, to present in

---

[3]    Because the parties' negotiations have taken a considerable length of time, Cobb anticipates that extension of the fact discovery period may be necessary.

which AMC informed one or more distributors that it did not intend to play day-and-date going forward with another theater within any particular film licensing zone":

- Studio Movie Grill Zona Rosa in Kansas City, Missouri (early 2010), which opened and then closed approximately six months later;

- Cobb's Brookhaven CinéBistro (January 2011);

- "a theater on Garrison St. in Dearborn, M[ichigan]" that has not opened (January 2011);

- Cinetopia's Overland Park 18 in Overland, Kansas (January 2011), which is running 30 to 50 percent below projections because of AMC's blanket clearance;[4]

- Viva Cinemas' Sharpstown 8 in Houston, Texas (May 2012), which went out of business shortly after opening due to AMC's blanket clearance;[5]

- Arclight Cinemas in La Jolla, California (August 2012);

- "a theater at Thomson Place and Seaport Blvd. in Boston, M[assachusetts]" (October 2012) that has not opened;

- "a theater at Westminster Mall (Westminster, C[olorado])" (October 2012) that has not opened;

- Latitude 39 in Indianapolis, Indiana (October 2012);

- My Image Studios in New York, New York (January 2013), which is not exhibiting films;

---

[4]    See Ex. 8 at 2.
[5]    See Ex. 9.

- LOOK Cinemas in Dallas, Texas (February 2013 with respect to the AMC Valley View 16, and again in September 2014 with respect to AMC's Village on the Parkway 9);

- Coyote Drive-In in Ft. Worth, Texas (February 2013);

- Silverspot, Village of Merrick Park in Coral Gables, Florida (May 2013), which has not opened;

- Deptford Movies in Deptford, New Jersey (June 2013), which has not opened;

- MJR Troy Grand 16 in Troy, Michigan (September 2013);

- Emagine Roseville in Roseville, Michigan (September 2013), which has not opened;

- iPic Wade Park in Frisco, Texas (July 2014), which has not opened;

- Cinemark Playa Vista 9 in Playa Vista, California (August 2014); and

- Arclight Santa Monica in Santa Monica, California (September 2015), which has not opened;

(Ex. 1 at Rog. 14.)  Upon receiving this list, Cobb offered a compromise:  It would not insist on the full volume of documents responsive to its RFPs that relate to other exhibitors, but it was requesting that AMC produce all documents that refer or relate to the non-AMC theaters and locations listed in AMC's response to Interrogatory No. 14.  (See Ex. 10 at 1–2.)  Cobb made clear that it is not seeking "day-to-day film licensing communications" for the relevant nearby AMC theaters. (Id. at 2 n.4.)

AMC has refused to produce the requested documents unless they refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies or practices (to be determined by AMC) or unless they fall into the narrow category of "documents reflecting AMC's initial request for clearances/ notification to distributors of AMC's intent not to play day and date with respect to" these theaters or locations.  (See Ex. 11.)

## ARGUMENT AND AUTHORITIES

By this Motion, Cobb respectfully asks the Court to compel AMC to produce all documents that refer or relate to the non-AMC theaters and locations listed in AMC's response to Interrogatory No. 14, regardless of whether, in AMC's estimation, they refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies or practices.  Relatedly, Cobb asks the Court to compel AMC to use the search terms set forth in Paragraph 19 of the Simonsen Declaration to locate such documents.

### A.    Legal Standard

"[A] party may move for an order compelling disclosure or discovery."  Fed. R. Civ. P. 37(a)(1).  "The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information."  Gober v. City of Leesburg, 197 F.R.D. 519, 521 (M.D.

127913476.1

Fla. 2000).

Rule 26 of the Federal Rules authorizes discovery of "matter[s], not privileged, that [are] relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Id.  "[D]istrict courts . . . are bound to adhere 'to the liberal spirit of the Federal Rules.'"  Adkins v. Christie, 488 F.3d 1324, 1331 (11th Cir. 2007) (quotation marks and alteration omitted).

"The broad scope of discovery permitted by Rule 26 has been held to be particularly appropriate in antitrust cases."  In re Intel Corp. Microprocessor Antitrust Litig., 2007 WL 137152, at *5 (D. Del. Jan. 12, 2007); see In re Plastics Additives Antitrust Litig., 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) ("It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining scope of discovery.").  That is because "[i]n [such] cases . . . broad discovery may be needed to uncover evidence of invidious design, pattern or intent."  Am. Health Sys., Inc. v. Liberty Health Sys., 1991 WL 30726, at *2 (E.D. Pa. Mar. 5, 1991); see In re Urethane Antitrust Litig., 261 F.R.D. 570, 573 (D. Kan. 2009) (same).

In circuit dealing cases such as this one—in which the plaintiff:

alleges that (1) [the defendant's] theater circuit outside of the market in which the [plaintiff's and defendant's theaters] compete is of such a size and nature as to give [the defendant] considerable power, and (2) [the defendant] has used that power to [the plaintiff's] detriment in the market in which the [defendant and plaintiff] compete[,] . . . in order to gather evidence to support its circuit dealing claim, [the plaintiff] must be permitted to engage in discovery concerning [the defendant's] theater circuit and film licensing practices outside the market in which the [plaintiff and defendant] compete.

Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc., 131 Cal. Rptr. 3d 519, 532 (Cal. Ct. App. 2011) (holding that "[t]he trial court's imposition of such a geographical limitation on [the plaintiff's] discovery was . . . erroneous");[6] see, e.g., Prudential N.Y. Theatres Co. v. Radio City Music Hall Corp., 271 F. Supp. 762, 762–63 (S.D.N.Y. 1967) (rejecting defendants' argument that "plaintiff has no right to secure information about theatres located outside the immediate geographical area which includes" the equivalent of the Buckhead-Brookhaven zone here because "inquiry has been permitted into activities of theatres other than those specifically designated in the complaint"); Parion Theatre Corp. v. RKO Theatres Inc., 319 F. Supp. 378, 379–80 (S.D.N.Y. 1970) (same); Eth-Lee Amusements, Inc. v. Metro-Goldwyn Mayer, Inc., 1963 WL 65923, at *2 (E.D.N.Y. Sept. 3, 1963) ("the interrogatories should not be confined to the

---

[6]    This California state court decision is persuasive authority because it interpreted and applied federal circuit dealing law and similar liberal discovery standards as those that apply in federal court. See 131 Cal. Rptr. 3d at 532.

activities of the [defendant's] Theatres [that were clearing plaintiff's theater]").

More generally, the "concept" that "[a]ntitrust cases, particularly those involving allegations of monopolization, call for broad discovery to uncover evidence of invidious design, pattern, or intent . . . applies equally to geographic scope" as it does to temporal scope. SmithKline Beecham Corp. v. Apotex Corp., 2006 WL 279073, at *3 (E.D. Pa. Jan. 31, 2006); see, e.g., United States v. Dentsply Int'l, Inc., 2000 WL 654286, at *5 (D. Del. May 10, 2000) ("The fact that the United States is the relevant market in this case does not necessarily limit discovery to the United States.") (citing Kellam Energy, Inc. v. Duncan, 616 F. Supp. 215, 219 (D. Del. 1985) ("regardless of how [the] geographic market is eventually defined in this action, the boundaries of that market do not set the geographic limit of discovery" because "the scheme of monopolization may involve an area larger than the plaintiff's own limited sphere of operations")).

AMC claims that its blanket clearances in Buckhead-Brookhaven are "reasonable" and "procompetitive."  (Ex. 1 at Rog. Nos. 6, 8; Ex. 12 ¶ 3; Doc. No. 50 ¶ 1(b).)  Cobb is entitled to discovery showing that the clearances AMC asserts in Buckhead-Brookhaven (and threatened with respect to the new build sites) are part and parcel of a larger campaign to use blanket clearances to thwart smaller, more innovative "predatory competitors" across the country—and not, as AMC

contends, isolated uses of supposedly "procompetitive" clearances justified by the specific facts and circumstances in each of the relevant zones.  See, e.g., Dentsply, 2000 WL 654286, at *5 ("a comparison between [defendant's] distribution policies in [the relevant market] and in other markets could be probative of the purpose and significance of [the challenged restraint] in the [the relevant market]").

More specifically, this Court observed in its Order denying AMC's Motion to Dismiss that discovery may show that AMC's clearances serve a procompetitive purpose if they "force theatres that are denied a license to certain movies to show alternatives, thereby increasing movie choices for consumers."  (Order, Doc. No. 44, at 20 n.6. (citing Theee Movies of Tarzana v. Pac. Theatres, Inc., 828 F.2d 1395, 1399–1400 (9th Cir. 1987)); see also AMC's Reply to Plaintiffs' Response to Motion to Dismiss, Doc. No. 29, at 12 n.9 (arguing that AMC's clearances "increase[] the variety of films offered to the public").)  Squarely at issue in this case, then, is the effects of AMC's clearances:  Do they, in fact, increase movie choices for consumers, or do they run competitors out of business, thereby reducing consumer choice?

The effects of AMC's clearances on other exhibitors are thus highly relevant and discoverable.  Of the eighteen instances outside of Buckhead-Brookhaven in which AMC admits to requesting blanket clearances since 2010, one is running

thirty to fifty percent below projections; one is not playing films at all; two opened and then closed only a few months later; and eight have not opened—because, Cobb believes at least in some cases, AMC made it known to the landlords who were considering leasing these theaters space that AMC would clear them, or because these theaters backed out after learning that AMC's clearances would prevent them from staying afloat. *See supra*, pp. 7–8. The rationale and effects of AMC's clearance demands in these other locations bear directly on the rationale and effects of AMC's clearance demands in Buckhead-Brookhaven and the eight other sites Cobb would have developed but for AMC's clearance threats. See, e.g., Natcontainer Corp. v. Cont'l Can Co., 362 F. Supp. 1094, 1102 (S.D.N.Y. 1973) (ordering discovery "directed toward acts of the defendant which might be restraints but which acts were directed against competitors of the defendant other than the plaintiff") (quotation marks omitted).

AMC's ability to demand and enforce clearances across its circuit is also evidence of AMC's circuit power—an element of Cobb's circuit dealing claim. That is, AMC's ability to dictate to distributors which exhibitors will receive licenses to play desirable first-run films and which will not is evidence of AMC's national circuit power, which AMC leverages over distributors. See, e.g., In re Auto. Refinishing Paint Antitrust Litig., 2004 U.S. Dist. Lexis 29160, at *12 (E.D.

Pa. Oct. 29, 2004) ("Evidence of foreign price-fixing among Defendants would also be material to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint."); Urethane Antitrust Litig., 261 F.R.D. at 574–75 ("the discovery requested by plaintiffs, without geographic limits, is relevant" because it "may help [plaintiffs] prove . . . the ability of defendants to engage in domestic price fixing, and the mechanisms employed by defendants in price fixing").

Moreover, AMC's actual and threatened assertion of clearances against other exhibitors is circumstantial evidence of its assertion of clearances against Cobb and the ability and likelihood of AMC to make good on its threats to use its "full weight and power" to prevent Cobb from developing new theaters.  See, e.g., Allied Shoe Mach. Corp. v. United Shoe Mach. Corp., 19 F.R.D. 181, 182 (D. Mass. 1956)  ("The interrogatories directed toward acts of the defendant which might be restraints but which acts were directed against competitors of the defendant other than the plaintiff seek information relevant to the case since notice by the defendant to a shoe manufacturer that the manufacturer could not use the machines made by a competitor other than the plaintiff is notice to that manufacturer that he cannot use machines of the same nature made by the plaintiff.").

Indeed, AMC will no doubt argue that AMC's clearance threats were not the proximate cause of Cobb's failure to develop the eight new build sites; rather, AMC will argue, Cobb unreasonably abandoned its plans based on a speculative assumption that AMC would clear Cobb's new theaters.  Evidence that AMC follows through on its threats to clear new sites—as it did in several of the instances documented in AMC's response to Interrogatory No. 14—is thus relevant.  It shows that Cobb's assumption that its new builds would have been cleared by AMC was not speculative, but rather well grounded in reality.

Finally, AMC is not entitled to anoint itself with unfettered discretion to withhold damaging documents.  AMC insists on producing only responsive documents that refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies and practices, where AMC has defined such "practices" as "documents that actually set out or described AMC's practices, not day-to-day operational documents created consistent with such practices."  (Ex. 4 at 5.)  This leaves Cobb to wonder in the dark about what universe of responsive documents AMC intends to withhold.  For example, during a meet-and-confer call, AMC's counsel stated that AMC would deem its "predatory competitor" presentation (Ex. 2) responsive even if the presentation did not specifically refer to Cobb or its theaters, because it refers or relates to AMC's "general" or "over-arching"

127913476.1

clearance policies and practices.  (See Simonsen Decl. ¶ 17.)  But AMC's counsel went on to state that if, hypothetically, there were an "internal document" talking solely about whether AMC should request a clearance with respect to "that Regal theater in Poughkeepsie," AMC would not produce such document because it apparently does not refer or relate to AMC's "general" or "over-arching" clearance policies and practices.  (Id.)

This is clearly a standardless distinction designed to enable AMC to avoid committing to what documents it will and will not produce and to manufacture *post hoc* justifications for withholding damaging documents.  Cobb respectfully requests that this Court order AMC to produce *all* documents that refer or relate to the non-AMC theaters and locations listed in AMC's response to Interrogatory No. 14, regardless of whether, in AMC's estimation, they refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies or practices.  See, e.g., In re Vitamins Antitrust Litig., 2001 WL 1049433, at *13 (D.D.C. June 20, 2001) ("[I]t is problematic to give defendants absolute discretion to withhold or redact documents they label as not 'concerning the United States.'  [C]ourts have expressed serious reservations about the problems posed by giving a party th[is] type of discretion[.]"); see also, e.g., In re Medeva Sec. Litig., 1995 WL 943468, at *8 (C.D. Cal. May 30, 1995) ("The Court does not welcome unilateral editing of

- 17 -

documents by the producing party.  Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured.").

## CONCLUSION

Cobb respectfully requests that the Court compel AMC to produce all documents that refer or relate to the non-AMC theaters and locations listed in AMC's response to Interrogatory No. 14, regardless of whether, in AMC's estimation, they refer or relate to Cobb or AMC's "general" or "over-arching" clearance policies or practices.  Relatedly, Cobb asks the Court to compel AMC to use the search terms set forth in Paragraph 19 of the Simonsen Declaration to locate such documents.

127913476.1

Dated:  September 18, 2015             **Fellows LaBriola LLP**

                                          /s/ Henry D. Fellows, Jr.
                                          Henry D. Fellows, Jr.
     Georgia Bar No. 257825
     Amy Durrence
     Georgia Bar No. 170398
     225 Peachtree Street, N.E., Suite 2300
     Atlanta, GA 30303
     Telephone:  404-586-9200
     Facsimile:  404-586-9201
     E-mail:  hfellows@fellab.com
     E-mail:  adurrence@fellab.com

     *-and-*

     **Perkins Coie**

     Thomas L. Boeder (*Pro Hac Vice*)
     tboeder@perkinscoie.com
     Eric J. Weiss (*Pro Hac Vice*)
     eweiss@perkinscoie.com
     Catherine S. Simonsen (*Pro Hac Vice*)
     csimonsen@perkinscoie.com
     1201 Third Avenue, Suite 4900
     Seattle, WA 98101-3099
     Telephone:  206-359-8000
     Facsimile:  206-359-9000

     *Attorneys for Plaintiffs*

127913476.1

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

/s/ Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
**FELLOWS LABRIOLA LLP**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will automatically send

email notification of such filing to all attorneys of record.

/s/ Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
**FELLOWS LABRIOLA LLP**

127913476.1